## STATE OF CONNECTICUT *v.* GERMANO KIMBRO
### (12139)

HEALEY, SHEA, DANNEHY, SANTANIELLO and CALLAHAN, JS.

Argued May 9—decision released August 20, 1985

*David S. Shepack,* deputy assistant state's attorney, with whom, on the brief, was *Carl Schuman,* assistant state's attorney, for the appellant (state).

*Jon C. Blue,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellee (defendant).

ARTHUR H. HEALEY, J. The defendant, Germano Kimbro, was arrested without a warrant on Novem-

ber 8, 1982, for the crime of possessing a narcotic substance, i.e., cocaine, in violation of General Statutes § 19-481 (a). He filed a motion to suppress[1] and a motion to dismiss,[2] claiming in each that his rights were violated under both the United States and the Connecticut constitutions. In his motion to suppress, he sought the suppression of items seized from his person as having been taken without a warrant or without probable cause or pursuant to an unlawful arrest. After an evidentiary hearing, the trial court granted both motions.[3] The state, with the permission of the trial court, has appealed. On appeal, the state claims that

---

[1] "MOTION TO SUPPRESS

"Pursuant to Practice Book Section 821 the Defendant in the above-entitled matter respectfully requests the Court to Suppress all items seized from the person of the Defendant as such search was conducted: (a) without a warrant, or (b) without probable cause to search, or (c) pursuant to an unlawful arrest, in violation of Article 1, Section 8 of the Connecticut Constitution and the Fourth and Fourteenth Amendments of the United States Constitution."

The defendant's motion to suppress actually cites "Article 1, Section 8 of the Connecticut Constitution" but there has never been any claim that anyone was misled by this obvious typographical error. Article first, § 7, however, is that provision which was involved. See footnote 15, infra.

[2] "MOTION TO DISMISS

"Pursuant to Practice Book Section 815 (10), the Defendant in the above-entitled matter respectfully requests the Court to dismiss the information as there is a lack of probable cause within the four corners of the arrest warrant, thereby denying the Defendant rights of Due Process under Article 1, Section 8, of the Connecticut Constitution and the Fourth and Fourteenth Amendments of the United States Constitution.

"Neither this motion nor one similar to it has previously been filed and decided in this case."

The defendant's motion to dismiss actually cites "Article 1, Section 8 of the Connecticut Constitution." Again, no claim has ever been made that anyone was misled by this obvious typographical error. See footnote 1, supra.

[3] Although the motion to dismiss in the record refers to an "arrest warrant," there was no arrest warrant. This motion alleged the lack of probable cause and the trial court so found at the end of the evidentiary hearing. At that time, the trial court, after learning that the state could not proceed to trial without the evidence it had suppressed, granted the defendant's oral motion to dismiss. It did so "with prejudice" so that the state could appeal.

the trial court erred (1) in granting the defendant's motion to suppress on its determination that the police lacked probable cause to arrest when they arrested the defendant, and (2) in granting the motion to dismiss.

At the outset, we turn to the state's threshold claim that the issue of "probable cause" in this appeal is to be determined solely by the "totality-of-the-circumstances" analysis set out in *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983), rather than by the stricter two-prong analysis of the *Aguilar-Spinelli*[4] cases which predated *Gates.*[5] In this case we do not agree.

The defendant specifically premised his trial court motions upon the Connecticut as well as the United States constitutions. The trial court, without stating the precise bases of its decision in granting suppression and dismissal, granted the defendant's motions. We are therefore entitled to infer that the trial court acted in favor of all the defendant's claims as they were asserted in his motions, especially when the trial court's decision, which was explicated in terms of the *Aguilar-Spinelli* analysis, had been based on the settled substantive law of this state before the *Gates* decision. See, e.g., *State* v. *Grayton,* 163 Conn. 104, 106, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972). On appeal, the state seeks to overturn the trial court's decision and, in doing so, argues in its brief that "*Gates* in no way [has] altered an individual's *ultimate* right not to be searched or seized in

---

[4] *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969).

[5] The United States Supreme Court announced its decision in *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983), on June 8, 1983. We note that the trial court's decision in the case before us was rendered on April 14, 1983.

the absence of probable cause. United States Constitution, Fourth Amendment; Connecticut Constitution, article I § 7." (Emphasis added.) In his brief, the defendant asserts the Connecticut constitution's preference for searches pursuant to a warrant and also argues that his motions below were predicated on both the United States and Connecticut constitutions. We conclude that the probable cause issue is properly before us under both the United States and Connecticut constitutions. See *State* v. *Couture,* 194 Conn. 530, 566–73, 482 A.2d 300 (1984) (*Healey, J.,* dissenting), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

We note that in none of our three earlier decisions in which we referred to *Gates* did any of the defendants claim that the respective circumstances failed to constitute probable cause under the Connecticut constitution. See *State* v. *Perry,* 195 Conn. 505, 488 A.2d 1256 (1985); *State* v. *Couture,* supra; *State* v. *Gasparro,* 194 Conn. 96, 480 A.2d 509 (1984). It is our view in this warrantless arrest and search case that the trial court's decision was correct under either the *Gates* "totality-of-the-circumstances" analysis or the *Aguilar-Spinelli* test.

*Gates,* of course, involved an application for a warrant, and it is crucial to underscore the fact that the *Gates* court reiterated that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Illinois* v. *Gates,* supra, 236. Rather, a reviewing court should pay "great deference" to the magistrate's determination of probable cause. Id., citing *Spinelli* v. *United States,* 393 U.S. 410, 419, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). In the same fashion, we do not attempt such de novo review where there has been a trial court determination that probable cause does *not* exist. In deciding whether probable cause does or does not exist, "[t]he trier of the facts

determines with finality the credibility of witnesses and the weight to be accorded their testimony. 'We cannot retry the facts or pass upon the credibility of the witnesses.' " *State* v. *Penland,* 174 Conn. 153, 157–58, 384 A.2d 356, cert. denied, 436 U.S. 906, 98 S. Ct. 2237, 56 L. Ed. 2d 404 (1978). This axiom is significant because the trier of fact, which in such a suppression hearing is the trial court, first determines the facts; then the trial court ultimately determines whether those facts it found constitute probable cause.[6] The former is obviously a fact-bound determination, while the latter is at the very least a mixed question of fact and law. See *Beck* v. *Ohio,* 379 U.S. 89, 96, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964).

It is clear that the constitutional validity of the search in this case is predicated upon the constitutional validity of the arrest, which was constitutionally valid only if at the time the police had probable cause to arrest the defendant. See *Beck* v. *Ohio,* supra, 91; *Brinegar* v. *United States,* 338 U.S. 160, 175–76, 69 S. Ct. 1302, 93 L. Ed. 1879, reh. denied, 338 U.S. 839, 70 S. Ct. 31, 94 L. Ed. 513 (1949). "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar* v. *United States,* supra, 176.

Certain observations concerning *Illinois* v. *Gates,* supra, should properly be made here. The *Gates* deci-

---

[6] In its brief, the state reiterates at some length the testimony of Officer Joseph Howard who was the only witness who testified at the suppression hearing. This recital overlooks the circumstance that not everything so recited was found as a fact by the trial court. Moreover, there is no suggestion in the transcript of the suppression hearing, the state's brief or oral argument that a contemporaneous written police report of the relevant events was ever made.

sion dismantled and abandoned the stricter "two-pronged test" of *Aguilar* and *Spinelli* in that it held that the sufficiency of an affidavit that relies on a confidential informant depends on "the totality-of-the-circumstances" test. While the *Gates* court reiterated the preference for search warrants, it seems fairly probable that the *Gates* test may be applied in fourth amendment cases to warrantless searches and seizures. See 1 LaFave, Search and Seizure: A Treatise on the Fourth Amendment (1985 Sup.) § 3.1, p. 172. Despite the abandonment of the two-pronged test of *Aguilar-Spinelli* in fourth amendment cases, the *Gates* court said that it "intended neither a rigid compartmentalization of the inquiries into an informant's 'veracity,' 'reliability,' and 'basis of knowledge,' nor that these inquiries be elaborate exegeses of an informant's tip"; it did emphasize that "[r]ather, we required only that *some* facts bearing on two particular issues be provided to the magistrate." (Emphasis in original.) Id., 231 n.6. Thus, the "veracity" and "basis of knowledge" issues are still viable though in the context of the less strict "totality-of-the-circumstances" analysis for the existence of probable cause. The *Gates* court agreed with the Illinois Supreme Court "that an informant's 'veracity,' 'reliability,' and 'basis of knowledge' are *all highly relevant* in determining the value of his report" (emphasis added) but it did not agree "that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . ." Id., 230. Rather, as the *Gates* court set out, "they should be understood simply as closely intertwined issues that may usefully illuminate the common-sense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." Id. Under *Gates,* "the duty of the reviewing court is simply to ensure that the

magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." (Citation omitted.) Id., 238–39; see *Massachusetts* v. *Upton,* 466 U.S. 727, 733, 104 S. Ct. 2085, 80 L. Ed. 2d 721 (1984). However, in rejecting the stricter test, the *Gates* court attempted to characterize its new approach as an "analysis that traditionally has informed probable-cause determinations." *Illinois* v. *Gates,* supra, 238. In rejecting the "independent status" of the two-pronged *Aguilar-Spinelli* test, the informant's "veracity" or "reliability" and his "basis of knowledge," the *Gates* court said that they were "better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."[7] Id., 233. According to the *Gates* court, the totality of the circumstances analysis was "far more consistent with our prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied by every informant's tip." Id., 230–31. The probable cause standard is a "practical, nontechnical conception," it deals with "probabilities," and " '[t]hese are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " Id., 231, quoting *Brinegar* v. *United States,* supra, 175–76. Fur-

---

[7] Justice White's concurring opinion in *Gates* forcefully notes that the majority's claim that a deficiency on one of the *Aguilar* prongs can be compensated for by a "strong showing" on the other cannot be taken literally. *Illinois* v. *Gates,* 462 U.S. 213, 272–73, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983) (White, J., concurring). One noted commentator has said that "were it so interpreted, it would lead to the bizarre result, repeatedly rejected by the [United States Supreme] Court in the past in cases reaffirmed by the *Gates* majority, that the unsupported assertion or belief of an honest person satisfies the probable cause requirement." 1 LaFave & Israel, Criminal Procedure (1984) § 3.3, p. 194.

thermore, " 'the [probable cause] process does not deal with hard certainties, but with probabilities' " and "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Id., 231–32. The court stressed that "[o]ur decisions applying the totality-of-the-circumstances analysis outlined above have consistently recognized the value of corroboration of details of an informant's tip by independent police work." Id., 241. The *Gates* court referred with approval to *Jones* v. *United States,* 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), where "[w]e [said] that even in making a warrantless arrest an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.' " *Gates* v. *Illinois,* supra, 242, quoting *Jones* v. *United States,* supra, 269.

While the *Gates* court laid down the totality of circumstances analysis, it did express both the preference for warrants and the deference to be given by appellate courts to determinations of probable cause. De novo appellate probable cause determination was specifically eschewed, and these admonitions were repeated in *Massachusetts* v. *Upton,* supra. With this background, we consider whether the trial court correctly determined that the state had *not* demonstrated the existence of probable cause in this warrantless arrest case.

It would appear that on November 8, 1982, Officer Joseph Howard had been a New Haven police officer for nearly nine years. At that time, he had been working for about a year and one-half with a city street crime unit whose primary function was narcotics enforcement. He had known the defendant Kimbro for more

than five years, had arrested him in the past,[8] and knew him to be a convicted felon recently released from prison. Over "approximately" two weeks before November 8, 1982, Howard had observed the defendant on Dixwell Avenue near Lake Place in New Haven "at least half a dozen times," and felt that it was unusual during periods of "inclement weather, cold weather" that he saw the defendant "loitering for extended periods of time" at that location. Howard said that "Dixwell [Avenue] and Lake Place is an area that we patrol . . . quite frequently . . . [and] we would drive through the area in search of wanted persons or illegal activity and during such travels I did note his presence there on those aforementioned occasions." He said that he knew "one of the [defendant's] home addresses," which was about two to three miles away, and he also said that he was not aware that the defendant worked at a garage across the street from the corner on which the November 8, 1982 arrest took place.

Howard testified that as the result of a telephone call[9] from "a known reliable informant," approximately five to ten minutes before the defendant's actual arrest, he and two other officers[10] proceeded to Dixwell Avenue and Lake Place. He believed that the informant, who had been a paid police informant, was reliable because information given in the past by him "had resulted in the apprehension of wanted felons . . . and one narcotics arrest,"[11] although he was not aware of any con-

---

[8] There was no evidence on what charges Officer Howard had arrested the defendant in the past.

[9] Howard said that he had been instructed by police radio to phone this informant at a certain location, and after saying that "[e]ither [Officer] Savinelli [who was with Howard] or I returned the call," he then said "I believe I did [return the call]."

[10] Officers Howard and Savinelli and Sergeant Gallo went to Dixwell Avenue and Lake Place at that time. Neither Savinelli, who had a broken hip, nor Gallo testified at the suppression hearing.

[11] Officer Howard also testified concerning this prior narcotics arrest and in response to the question: "When you made that [earlier] arrest, did you

victions resulting from any of those instances. Howard had known this informant for several months.

With reference to what Howard testified the informant told him, the trial court in its oral decision said that "what impressed me also was the fact that Officer Howard couldn't really tell exactly what the informant had told him and there were no details involved." The court felt that it was important as to "what weight should [be given] to Officer Howard's testimony as to the credibility or reliability of the informant. I have to find that the informant was credible or reliable."

Such matters are for the trier of fact and not for appellate review. In cases involving constitutional safeguards, as this did, in passing upon the trial court's determination on the issue of probable cause, it is best we remember that we do not sit " 'as in *nisi prius*,' " and, therefore, deference is due the trial court's decision of that issue. *State* v. *Ricci,* 472 A.2d 291, 298 (R.I. 1984); *State* v. *Roberts,* 434 A.2d 257, 264 (R.I. 1981); see *Culombe* v. *Connecticut,* 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961).

The trial court also stated that "there are no circumstances in this case corroborating the informant, except the fact that he [the defendant] was at this particular corner when the police arrived there." This last circumstance the trial court did not consider "paramount," because Howard had seen the defendant there a half dozen times recently; moreover, the defendant worked in that area. Noting the lack of evidence of any prior arrests or convictions involving narcotics of Kimbro, the court attached "no indication of anything" to the circumstance that the defendant merely "backed away"

---

find narcotics on that person?" he answered: "When we approached that person they did discard items that were later proven to be heroin."

In oral argument before us, the state admitted that a fair reading of this portion of the transcript indicated that that earlier arrest was a "dropsy" case. See *People* v. *McMurty,* 64 Misc. 2d 63, 66, 314 N.Y.S.2d 194 (1970).

when Howard approached him. It concluded that there were "insufficient circumstances for the determination that the informant was credible or that his information was reliable." The "reliability" necessary for the existence of probable cause to arrest applies as much to the information provided as to the informant who provides it. *Cioci* v. *Santos,* 99 R.I. 308, 313, 207 A.2d 300 (1965).

The transcript also discloses that Howard testified on direct that the informant told him that the defendant was on Dixwell Avenue near Lake Place and "was in possession of and offering for sale what the defendant purported to be cocaine." While he did not recall the "exact verbiage [of the informant,] the conversation was that Mr. Kimbro was in possession of it, that he was offering it for sale on the street and that the informant had seen the package that was offered, that was purported to be cocaine."

On cross-examination Howard admitted that the informant did not tell him that he (the informant) "had seen narcotics on the defendant" but "merely packages of what the defendant was purporting to be cocaine." He also said at first that the informant did not tell him he had seen an actual sale. Asked how the informant "knew" that the defendant "was in fact purporting to have cocaine," Howard replied that the informant overheard "the defendant purport that the package of substance was cocaine." He was asked again if the informant told him whether he had seen an actual sale. After a colloquy the court said that "one of the problems with this hearing is that . . . if the officer would just *say* what he said instead of trying to *paraphrase* what he said." (Emphasis added.) The court thereupon instructed the officer to do so. Howard then said the informant did not know it was cocaine except that he "overheard" and "observed the packages being displayed and the offer of the purported cocaine for

sale."[12] He thereafter repeated that the informant had not told him that he had seen a drug sale. During this portion of the cross-examination the court itself asked the officer questions and indicated that the testimony was "confusing." Howard was also asked, based on his "observation" of the defendant over the period of two weeks in the same area, whether he had ever observed the defendant in a drug transaction. He said that "I could have and never even known it" because "small objects" are involved in such a transaction. Upon arriving at the location where the defendant was standing, Howard, who had not observed any drug activity, *first* placed the defendant under arrest and *then* searched him pursuant to the arrest. That search disclosed several packages, a sample of which was later found to include cocaine.

We have already noted that this case, unlike *Gates,* involves a warrantless arrest and search.[13] While we endorse the *Gates* majority's preference for warrants, we must recognize that, while the state makes no such claim in this case, it is not always reasonably practicable to get a warrant. The state instead suggests that this is a conventional type of case with probable cause evident under *Gates,* thus justifying the warrantless arrest and the resulting search and seizure. Where, in warrantless arrests or searches, the police involved, in effect, act as their own magistrate in the determina-

---

[12] Officer Howard said that he could not quote the informant exactly, pointing out that the arrest had taken place several months ago. The arrest was on November 8, 1982, and the suppression hearing was on April 14, 1983. There is no indication of any written police report of this arrest and its circumstances in the record before us.

[13] One noted commentator points out that the preference for warrants "has resulted in a subtle difference between the probable cause required when there is no warrant and that required when there is. As the court put it in *United States* v. *Ventresca,* [380 U.S. 102, 106, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965)], 'in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.' " 1 LaFave & Israel, Criminal Procedure (1984) § 3.3, p. 185.

tion of the existence of probable cause, obviously fourth amendment protections still apply. See 1 LaFave & Israel, Criminal Procedure (1984) § 3.3, p. 185. That amendment " 'protects all, those suspected or known to be offenders as well as the innocent . . . .' " (Citation omitted.) *Ker* v. *California,* 374 U.S. 23, 33, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963). It is well to remember that, unlike some other constitutional rights, there is no realistic way that an innocent person can invoke advance protection from unconstitutional searches and seizures, but rather the choice is either to submit to whatever the governmental authority undertakes or to resist at a possibly greater risk. See *Brinegar* v. *United States,* 338 U.S. 160, 182, 69 S. Ct. 1302, 93 L. Ed. 1879, reh. denied, 338 U.S. 839, 70 S. Ct. 31, 94 L. Ed. 513 (1949) (Jackson, J., dissenting).

In this case, the informant himself was the source of the information upon which the police acted. The "veracity" or "reliability" of this informant was of great concern to the trial court. The paid informant's track record has been set out; there were prior arrests of "wanted felons," but the one and only prior narcotics arrest was a "dropsy" case. No convictions had resulted from any information he had conveyed. He gave no information of any prior conduct of the defendant involving narcotics, nor did the police, singly or collectively, know of or suspect any prior conduct of the defendant with narcotics.[14] This is true although he had been the subject of police observation for at least two weeks at that area where he was arrested.

There is little doubt that the veracity of an informant is enhanced where he makes a statement under oath or where his information is corroborated by police

---

[14] Although the officer testified that the defendant had recently been released from prison, there was no evidence that the defendant had since that release been suspected of engaging in *any* criminal activity prior to his instant arrest.

observation, especially where the informant's information is in some detail. This police corroboration, of course, is, as in the cases where there is a warrant, that which results from prior independent police investigation. See *United States* v. *Canestri,* 518 F.2d 269, 272 (2d Cir. 1975); see also *State* v. *Jackson,* 162 Conn. 440, 448, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972) ("[w]here information from different sources dovetails, corroboration exists"). In determining the reliability of information provided by an informant, we have relied upon the reputation or past criminal behavior of the suspect as a practical consideration. See *State* v. *Ferguson,* 185 Conn. 104, 115, 440 A.2d 841 (1981). There is no evidence in this record that this informant knew anything of the defendant's reputation or past criminal behavior. Howard, of course, knew of the defendant's release from prison, but an officer's knowledge of the reputation of a suspect is not alone enough to constitute probable cause. See *United States* v. *Canestri,* supra, 272–73.

In this case, the informant indicated what he saw of this defendant's conduct prior to informing the police. We, as an appellate court, should not evince a grudging attitude toward the trial court's ultimate assessment of the evidence before it, when that assessment is reasonably supportable on the credible evidence. Practice Book § 3060D; see *Solomon* v. *Aberman,* 196 Conn. 359, 377–78, 493 A.2d 193 (1985). In the present case the trial court was not indulging in the hyper-technicality which *Gates* disapproves, but, rather, as was evident from the transcript, it was sifting and evaluating the oral evidence presented.

What may be called the "basis of knowledge" circumstance in the totality of circumstances discloses that there was no evidence that this informant bought or even saw the alleged narcotics. We say this aware that

whatever a person knowingly exposes is not constitutionally protected from observation. *United States* v. *Burns*, 624 F.2d 95, 100 (10th Cir. 1980); see *Katz* v. *United States*, 389 U.S. 347, 363, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (White, J., concurring). In this case, given the complete lack of any independent police investigation or information tending to corroborate the informant's information, we conclude that the trial court's finding that probable cause was not demonstrated is supported in this record. Furthermore, although the trial court properly employed the *Aguilar-Spinelli* test, what we have pointed out clearly demonstrated that probable cause could not exist even under the *Gates* totality of the circumstances test.

In light of our conclusion that even under the *Illinois* v. *Gates* approach the motion to suppress was properly granted, we ordinarily need say no more. In this case, however, the defendant also asserted the protection of the Connecticut constitution in his motion to suppress. We thus address this claim separately in accordance with the decision of *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). In turning to article first, § 7, of the Connecticut constitution,[15] we must decide whether that provision affords more substantive protection to citizens than does the fourth amendment to the federal constitution in the determination of probable cause. We conclude that it does.

Although we have not previously determined this particular question, we have invoked our constitution in the protection of individual rights. See, e.g., *State* v. *Couture,* 194 Conn. 530, 482 A.2d 300 (1984), cert.

[15] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

Identical provisions were contained in the Connecticut constitutions of 1818 and 1955 (art. I § 8).

denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *Gaines* v. *Manson,* 194 Conn. 510, 481 A.2d 1084 (1984); *State* v. *Ferrell,* 191 Conn. 37, 463 A.2d 573 (1983); *Horton* v. *Meskill,* 172 Conn. 615, 376 A.2d 359 (1977). We clearly have the power to construe the Connecticut constitution in accordance with our particular analysis of the specific right in issue.[16] Only recently we have said that "[f]ederal law, whether based upon statute or constitution, establishes a minimum national standard for the exercise of individual

---

[16] In doing so, we fully understand that we cannot afford any lesser protection than that to which a comparable right is entitled under the United States constitution.

The dissenting opinions seem to intimate that we are ignoring settled principles in our resolution of this case. We have only recently said, however, that "[f]ederal law, whether based upon statute or constitution, establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984), and cases cited therein. This court has recognized this as its duty and, in this specific context, we said quite clearly in *Horton* v. *Meskill,* 172 Conn. 615, 376 A.2d 359 (1977), that "[i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." Id., 641–42. Further, we have frequently invoked the principle of *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), in cases involving criminal defendants' rights that this court has decided were abridged. See *State* v. *Scully,* 195 Conn. 668, 674 n.11, 490 A.2d 984 (1985); *Gaines* v. *Manson,* 194 Conn. 510, 528 n.15, 481 A.2d 1084 (1984); *State* v. *Cohane,* 193 Conn. 474, 498–99 n.19, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); *State* v. *Ferrell,* 191 Conn. 37, 45 n.12, 463 A.2d 573 (1983); see also *State* v. *Couture,* 194 Conn. 530, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Therefore, it is by now settled in our jurisprudence that, when it has been raised in a case, the Connecticut constitution may serve as an alternative, independent basis of our decision, as it has done in this case.

rights and does not inhibit state governments from affording higher levels of protection for such rights." (Citations omitted.) *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 57, 469 A.2d 1201 (1984). In taking this position we recognize, as we must, the authority of the United States Supreme Court to act as the final arbiter of controversies arising under the United States constitution. This was established early in the history of our republic. See *Cohens* v. *Virginia,* 19 U.S. (6 Wheat.) 264, 5 L. Ed. 257 (1821) (authority to review state criminal cases); *Martin* v. *Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 4 L. Ed. 97 (1816) (authority to review state civil cases). We also recognize, and the United States Supreme Court has acknowledged, that such authority is limited when the federal courts undertake to review state court decisions construing state law. In *Michigan* v. *Long,* supra, 1041, Justice O'Connor, writing for the majority, said: "If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision." In construing article first, § 7, of our constitution in this case, we recognize that protections under our constitution may be afforded in accordance with *Michigan* v. *Long,* supra. It appears settled that federal court decisions do not limit the rights of state courts to afford greater rights than under the federal constitution. See, e.g., *Pruneyard Shopping Center* v. *Robins,* 447 U.S. 74, 81, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980); *Oregon* v. *Hass,* 420 U.S. 714, 719, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975); see also Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harv. L. Rev. 489 (1977).

The determination of "probable cause" under article first, § 7, is not to be made under the "fluid" concept of that term as set out in *Gates,* but rather, under

the established principles developed in *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). See *Commonwealth* v. *Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985) (after remand); *State* v. *Jackson,* 102 Wash. 2d 432, 688 P.2d 136 (1984). Citation is not necessary to demonstrate this court's invocation over the years of the *Aguilar-Spinelli* test, which we submit has not been applied hypertechnically.

We eschew the amorphous standard of *Gates*[17] in passing upon article first, § 7, interpretation and apply the more specific standards of the *Aguilar-Spinelli* test, as did the Massachusetts Supreme Judicial Court on remand from the United States Supreme Court in *Commonwealth* v. *Upton,* supra.[18] See also *State* v. *Jackson,* supra.[19] The *Aguilar-Spinelli* test, with its two prongs of "veracity" or "reliability" and "basis of knowledge," offers a practical and independent test under our con-

---

[17] In addition, we note that our legislature by statute has essentially incorporated the *Aguilar-Spinelli* test as a requirement for information to be included in a wiretap or electronic surveillance application. See General Statutes § 54-41c; *State* v. *Ross,* 194 Conn. 447, 463, 481 A.2d 730 (1984).

Noted commentators in the field have been critical of the *Gates* approach by the United States Supreme Court. See Kamisar, *"Gates,* 'Probable Cause,' 'Good Faith,' and Beyond," 69 Iowa L. Rev. 551, 569–584 (1984); LaFave, "Fourth Amendment Vagaries (Of Improbable Cause, Imperceptible Plain View, Notorious Privacy, and Balancing Askew)," 74 J. of Crim. L. & Criminology 1171, 1186–97 (1983); 1 LaFave, Search and Seizure: A Treatise on the Fourth Amendment (1985 Sup.) §§ 2.4 through 2.6, pp. 134–41, 143–45.

[18] We identify with the concern of the Massachusetts Supreme Judicial Court on remand when it said in *Commonwealth* v. *Upton,* 394 Mass. 363, 370 n.7, 476 N.E.2d 548 (1985), "[w]e do not know whether the Supreme Court of the United States intended a lower definition of probable cause when, in *Illinois* v. *Gates,* 462 U.S. 213 (1983), it used words such as 'fair probability' (id. at 238) and 'substantial chance' (id. at 244 n.13)."

[19] The Washington Supreme Court has rejected application of the *Gates* approach under the Washington state constitution calling the *Gates* standard "nebulous." See *State* v. *Jackson,* 102 Wash. 2d 432, 435, 688 P.2d 136 (1984).

stitution that predictably guides the conduct of all concerned, including magistrates and law enforcement officials, in the determination of probable cause. This test protects individual rights without disadvantaging law enforcement. It is salutary to recall, as Justice Brennan has said, that "one of the strengths of our federal system is that it provides a double source of protection for the rights of our citizens." Brennan, supra, 503.

The circumstances relevant to the issue of probable cause in this case have been set forth earlier in this opinion. As we have demonstrated above, the trial court made no piecemeal analysis of the testimony in applying the *Aguilar-Spinelli* test in this case. It concluded that there were "insufficient circumstances for the determination that the informant was credible or that his information was reliable." The trial judge said that he did not have "any real evidence here about the reliability of this informant and the fact they made one narcotics arrest [the dropsy case] does not give me that evidence of reliability." Additionally, the trial court pointed out that "there are no circumstances in this case corroborating the informant, except the fact that he [the defendant] was at this particular corner when the police arrived there." Actually, the corroboration to which the court referred should have been corroboration existing prior to that time when the police decided to make the arrest and after an evaluation of the informant's information with whatever independent police information known to them at that time. As pointed out, the police had absolutely no self-verifying detail in their collective knowledge to add to the informant's information. Even though they had been observing him for about two weeks and knew he was recently released from prison, they had, on this record, no knowledge of any prior narcotics history of any sort of this defendant. The deference to be given a finding of probable cause should, even-handedly, not be diluted

in evaluating a trial court's finding of no probable cause. This includes the trial court's careful evaluation of all the evidence.

While it is not crucial in this warrantless arrest and seizure case, we note the rationale of *United States* v. *Ventresca,* 380 U.S. 102, 109, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965), that "doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants." The real question is not "whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest." *United States* v. *Watson,* 423 U.S. 411, 417, 96 S. Ct. 820, 46 L. Ed. 2d 598, reh. denied, 424 U.S. 979, 96 S. Ct. 1488, 47 L. Ed. 2d 750 (1976). "There is no more basic constitutional rule in the Fourth Amendment area than that which makes a warrantless search unreasonable except in a few 'jealously and carefully drawn' exceptional circumstances." *United States* v. *Watson,* supra, 427 (Powell, J., concurring). This clearly applies under article first, § 7, of the Connecticut constitution. The common sense application of the *Aguilar-Spinelli* test in this case by the trial court in its determination that there was not probable cause was not clearly erroneous, and the result reached under that test was constitutionally mandated under article first, § 7, of the Connecticut constitution.

There is no error.

In this opinion DANNEHY and SANTANIELLO, Js., concurred.

SHEA, J., dissenting. The majority opinion goes far out of its way in seizing upon this case as the occasion to reject the "totality-of-the-circumstances" test established by the United States Supreme Court in *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L.

Ed. 2d 1453 (1983), as the touchstone for ascertaining probable cause to justify a search or seizure under the fourth amendment of our federal constitution. In two recent cases, *State* v. *Perry,* 195 Conn. 505, 508, 488 A.2d 1256 (1985), and *State* v. *Gasparro,* 194 Conn. 96, 106, 480 A.2d 509 (1984), this court has given its endorsement to *Gates,* declaring that " '[t]he determination of probable cause must be made from the "totality of the circumstances." ' " *State* v. *Gasparro,* supra. As applied in *Gates,* this broader statement of the criterion for determining probable cause obviated the necessity for disclosure of the manner in which the informant had acquired the information he had conveyed to the police, the so-called "basis of knowledge" part of the *Aguilar-Spinelli* test. Under that test "the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were . . . ." *Aguilar* v. *Texas,* 378 U.S. 108, 114, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); see *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). In the case before us, the testimony was clear that the informant had personally observed the defendant offering packages he represented to contain cocaine for sale on the streets.[1] Thus the "basis of knowledge"

---

[1] Officer Howard, who had received the tip from the informant, testified in this respect as follows:

"I don't recall the exact verbiage but the conversation was that Mr. Kimbro was in possession of it, that he was offering it for sale on the street and that the informant had seen the package that was offered, that was purported to be cocaine."

On cross-examination, after responding that the informer had not told him he had seen an actual sale, the testimony of Howard continued:

"Q. He did not tell you he had seen an actual sale. Did he tell you he had seen narcotics on the defendant?

"A. No, merely packages of what the defendant was purporting to be cocaine.

"Q. What the defendant was purporting to be cocaine?

"A. Yes.

"Q. How did the informant know that the defendant was in fact purporting to have cocaine?

prong of the *Aguilar-Spinelli* test, which might not have been satisfied in *Gates,* was easily surpassed here. The so-called "veracity prong" of *Aguilar-Spinelli,* whether the police have reasonable grounds for crediting the information concerning criminal activity furnished by the informant, remains essentially untouched by the *Gates* "totality-of-the-circumstances" formulation. It is therefore wholly unnecessary for our disposition of this case to decide what we may do if we should some day be confronted with a situation like *Gates* where the "basis of the informant's knowledge" is left to be inferred entirely from the details contained in the information furnished, some of which may have been verified by other sources. There is nothing in the language or history of article first, § 7, of our state constitution, paralleling the fourth amendment of our federal constitution, that mandates any particular test for determining the ultimate constitutional requirement of the existence of probable cause prior to a search. No one questions the authority of this court to construe our state constitution to afford greater protection to individual rights than that afforded by our federal constitution; see *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984); but it is wholly inappropriate to declare our position in a particular instance before we have a case presenting the issue. Accordingly, I would follow our customary practice of not crossing constitutional bridges until we come to

"A. The informant had overheard the defendant purport that the package of substance was cocaine."

Upon inquiry by the court as to how the informant knew the defendant was offering cocaine for sale, Howard testified further:

"Mr. Howard: Overheard--well, you can call it a transaction. A transaction is something that takes place between people.

"The Court: He said he had overheard what?

"Mr. Howard: And observed the packages being displayed and the offer of the purported cocaine for sale.

"Q. How did he know it was cocaine?

"A. The only way he knew was by Mr. Kimbro purporting it to be that."

them. *Carofano* v. *Bridgeport,* 196 Conn. 623, 647, 495 A.2d 1011 (1985).

I also disagree with the majority's resolution of this appeal under the standard two-pronged *Aguilar-Spinelli* test. As previously noted, the basis for the informant's report of criminal activity in progress, the first prong of the test, was his personal observation of the defendant's activities at the location specified.[2] Such a situation "presents few problems: since the report, although hearsay, purports to be first-hand observation, remaining doubt centers on the honesty of the informant . . . ." *Spinelli* v. *United States,* supra, 425 (White, J., concurring). It is this remaining veracity prong that the trial court as well as the majority maintain is not satisfied by the evidence presented at the suppression hearing.

The majority opinion sets forth a plethora of arguments to support the conclusion of the trial court that the police could not reasonably have relied on the information supplied by the informant in arresting and searching the defendant. Among them are: (1) the deference due the trial court's determination; (2) the lack of a warrant for the arrest or search; (3) an insufficient "track record" of the reliability of previous tips given by the informant, none of which had thus far resulted in a conviction; (4) the fact that, because the defendant may have worked near the location where he was reported to be selling cocaine, Officer Howard's several observations of him loitering there for extended periods of time and for no apparent reason were not actually corroborative of the reliability of the informant; and (5) the absence of any knowledge by the police or indication in the informant's report concerning prior drug related activities of the defendant. None of these can withstand analysis.

---

[2] See footnote 1, supra.

First. With respect to our function in reviewing trial court decisions on probable cause, it is clear that upon disputed *factual* issues we are ordinarily bound by the finding of the judge who heard the evidence. We ought not, however, to defer to the legal conclusions drawn from those facts if in our judgment they are clearly erroneous. Practice Book § 3060D. We have heretofore treated probable cause as a question of law to be reviewed in the light of the subordinate facts found by the trial court or presented to us as undisputed. See *State* v. *Daley,* 189 Conn. 717, 458 A.2d 1147 (1983); *State* v. *Jackson,* 162 Conn. 440, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed 2d 121 (1972). In the present case the trial court made no finding that the information given to the police by the informant was not as indicated by Howard's testimony. The court concluded simply that the information received was insufficient as a matter of law to justify a reasonable belief that the defendant had engaged in criminal activity. No more deference is due that determination than any other trial court decision on a question of law.

Second. It is utterly ridiculous to suggest that when the police receive a report of criminal activity presently occurring in a public street they must await issuance of a warrant before taking action. By the time the application for the warrant can be prepared and a judge found available the felon would be long gone. Effective law enforcement under such a requirement would be impossible. The report received by Howard five or ten minutes before the arrest was that the defendant was then engaged in selling narcotics. If Howard had reasonable grounds to credit that report, delaying action until a warrant could be obtained would have been a dereliction of his duty to prevent crime.

Third. The prior experience of Howard with this informant demonstrates an ample basis for his reli-

ance upon the truth of the report received. Three previous arrests had been made on the basis of information furnished by the same informant, "[o]ne narcotics arrest and . . . two wanted felons." Howard had participated in the narcotics arrest and when the suspect was approached he discarded some items containing heroin. Because Howard had been acquainted with the informant only for several months, he was aware of no convictions that had resulted from this informant's tips, because the cases were still pending in court. Convictions are not essential for an informant to have an acceptable reputation for reliability. 1 LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 3.3, p. 510. "Courts have consistently held that an informant's track record is sufficiently established by a showing (i) that on one or more previous occasions the informant indicated that a certain object, usually narcotics . . . are concealed at a certain place, and (ii) that this information was verified as true by a search which uncovered the specified items at the place indicated." Id., p. 511. The circumstances of the prior narcotics arrest, resulting from this informant's tip, in which Howard had participated make this principle applicable to establish adequately the reliability of the informant even without the successful experience of the police with the information concerning the two wanted felons.

Fourth. The fact that Howard had seen the defendant loitering for extended periods of time at Dixwell Avenue and Lake Place even during cold and inclement weather did tend to confirm in his view the accuracy of the information received from the informant. Although the defendant may have worked in the vicinity, the location of his employment was not known to Howard at the time of the arrest and has no bearing upon the reasonableness of his judgment at that time. The weight given by the trial court as well as the

majority to this innocent though unsupported[3] explanation of the defendant's frequent presence at the location where he was arrested is misplaced for the same reason that the fruits of a search, such as the cocaine found upon the defendant, cannot be used to justify the search.

Fifth. It is highly novel to suggest, as the majority opinion does, that Howard's acquaintance with the defendant, whom he had once arrested, as a convicted felon recently released from prison was wholly insignificant in the probable cause determination because he was unaware of any prior involvement of the defendant with drugs. Courts frequently rely upon felony convictions as evidence of character just as lay persons do without consideration of the nature of the particular felony involved. See General Statutes § 52-145 (b); *State v. Nardini*, 187 Conn. 513, 523–25, 447 A.2d 396 (1982).

The case before us provides a stronger basis for relying upon the information supplied by the informant than that approved by the United States Supreme

---

[3] The only testimony at the suppression hearing concerning the defendant's place of employment occurred during the cross-examination of Officer Howard as follows:

"Q. Officer, you stated that you had observed him for two weeks and that you knew where he lived, you had his home address. Did you know where he worked?

"A. No, ma'am.

"Q. Were you aware that he worked across the street, at the Triangle Garage, from the corner where he was found?

"A. I didn't have any knowledge of that nor do I now.

"Q. Now you do."

The last remark by the defendant's attorney, designated as a question in the transcript, does not qualify as testimony. See generally *State v. Ubaldi*, 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 462 U.S. 1001, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). Nevertheless, the trial court in rendering its decision declared: "The fact that the officer testified that he had seen [the defendant] loitering at that corner about half a dozen times in the past did not impress me either, particularly in view of the indication that he worked in that area."

Court in *Draper* v. *United States,* 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959), where a paid informant, who had given other information of narcotics violations found to be reliable during the preceding period of about six months, notified the arresting officer that the defendant would be returning to Denver from Chicago by train on one of two successive days with three ounces of heroin in his possession. He also gave a detailed description of the defendant and the clothing he would be wearing. When the defendant alighted from the train garbed as predicted he was arrested. The court upheld the finding of probable cause despite the absence of: (1) any disclosure of the basis for the informant's knowledge of the defendant's activities other than inferences that could be drawn from the details of his description and the accuracy of his prediction; (2) any "track record" of prior convictions based on previous tips of the informant; and (3) any confirmation by police observation of anything but noncriminal conduct of the defendant. "The detail provided by the informant in *Draper* v. *United States,* [supra,] provides a suitable benchmark." *Spinelli* v. *United States,* 393 U.S. 410, 416, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969).

In the present case, the informant had obtained the information he gave the police by personal observation and was willing to risk his reputation for reliability as well as his source of income by reporting a crime in progress. He must have realized his report would be subjected to immediate verification by police action, as it was. Under these circumstances I cannot affirm the conclusion of the majority as well as the trial court that it was unreasonable for Howard to rely upon the truth of the information he had received and to arrest the defendant.

Accordingly, I dissent.

CALLAHAN, J., dissenting. I concur with Justice Shea's dissenting opinion.

I find myself at a loss as to why the majority feels it necessary to determine gratuitously that article first, § 7, of the Connecticut constitution requires the application of the *Aguilar-Spinelli* tests to a determination of probable cause.

I am in agreement with what was stated by the United States Supreme Court in *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983), that "the 'two-pronged test' has encouraged an excessively technical dissection of informants' tips, with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate." Id., 234–35.

"The strictures that inevitably accompany the 'two-pronged test' cannot avoid seriously impeding the task of law enforcement . . . ." Id., 237.

"We are convinced that this flexible, easily applied standard [totality-of-the-circumstances] will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli.*" Id., 239.

I feel that making *Aguilar* and *Spinelli* the test for determining probable cause under the state constitution is a step backward into that labyrinthine body of hypertechnical rules concerning the criminal law from which I thought we were gradually beginning to emerge.