## STATE OF CONNECTICUT *v.* BENJAMIN F. RALSTON, JR.
## (3741)

DUPONT, C. J., BORDEN and SPALLONE, Js.

Argued March 11—decision released June 17, 1986

*C. Robert Satti, Jr.,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellant (state).

*Anthony J. DePanfilis,* with whom was *Margaret M. Vallerie,* for the appellee (defendant).

BORDEN, J. The state appeals, with the permission of the trial court, from the judgment dismissing with prejudice the information against the defendant following the suppression of wiretap evidence. The issues involve: (1) the sufficiency of the affidavits accompanying the applications to support the findings of probable cause for the issuance of the wiretap orders; (2) whether probable cause was required as to this defendant, whose telephone was not the subject of the orders but who was one of the named targets of the taps; and (3) whether General Statutes § 54-41c (7) precludes from the probable cause determination information discovered more than twenty days prior to the date of the wiretap application. We find error and remand for further proceedings.

The defendant was charged with four counts involving possession, possession with intent to sell and possession with intent to use various illicit drugs, and with three counts of illegal possession of a pistol. These charges derived principally from evidence gathered pursuant to a search warrant directed at the defendant's residence. Although this record is not clear, the charges also apparently derived from evidence gathered pursuant to a warrantless search of his car.

The defendant received the statutory notice that his telephone conversations had been intercepted pursuant to wiretap orders directed at the business telephones and the residence telephone of James Sayball, and pur-

suant to extensions of those original orders. He moved to suppress all the evidence gathered as a result of these searches on the basis, inter alia, that it derived from the original wiretap orders which were invalid. In the trial court, the state conceded that if the original wiretap orders were invalid, the evidence against the defendant was suppressible. The court ruled orally, without elaboration, that the original wiretap applications were facially invalid, and it suppressed the evidence. Based on the state's concession, this was the only determination which the trial court made, and it is the only one which we review in this appeal. Upon the state's representation that it would be unable to proceed against the defendant without the suppressed evidence, the court dismissed the information with prejudice. This appeal followed.

I

General Statutes § 54-41c requires that a wiretap application include thirteen specified sets of information which will permit the three judge wiretap panel to make a finding of probable cause, pursuant to General Statutes § 54-41d, as to nine specified criteria. See State v. Ross, 194 Conn. 447, 456–62, 481 A.2d 730 (1984). Because the trial court issued no memorandum of decision, orally or in writing, and because the state did not move for articulation, it would therefore arguably be necessary to review all twenty-two items. The parties have, however, narrowed the issues in this appeal to three, and our review of the two original wiretap applications and their accompanying affidavits satisfies us that all the other criteria, required by General Statutes §§ 54-41c and 54-41d, were fully met.

By two essentially similar applications dated October 14, 1983, the state's attorney for the Fairfield judicial district requested authorization to wiretap two telephone facilities: two telephone lines located at the Monroe Fish Market on Main Street in Monroe, Con-

necticut, which was owned and operated by Sayball, and one telephone line located at Sayball's residence, on Old Newtown Road, in Monroe. The applicant claimed that the telephone lines were being used for the illegal sale of narcotics and of controlled substances. The applicant sought permission to intercept the conversations of the following persons: James Sayball, also known as "Raccoon"; Francis Scarano; Edward Lipnickas, Jr.; Michael J. Desmond; John L. Uberti; Carl Willsey; Benjamin F. Ralston, Jr., the defendant in this case; and Frederick Cavuoto. The applicant named these individuals as persons who have committed or are committing the offenses, or whose intercepted conversations may provide evidence of such offenses. On the basis of the applications and their underlying affidavits, a three judge panel issued wiretap orders on October 17, 1983.

Each application was supported by essentially the same affidavit of Inspector John F. Solomon, of the Connecticut division of criminal justice. The critical portions of Solomon's twenty-six page affidavit are as follows: On or about June 16, 1980, Sergeant Norman Mercier, commanding officer of the Monroe police department, received, from "a reliable and upstanding citizen," information about a large-scale narcotics operation involving James Sayball at his business establishment known as the Monroe Fish Market on Main Street in Monroe, Connecticut. The informant, the reliability of whom no independent information was supplied, purportedly was acting as a concerned citizen who wanted to pass on information regarding the drug trafficking activities of Sayball, of Mark Ricca and of unknown others. The informant also told Mercier that he had been told by someone with personal knowledge that Sayball was transporting cocaine from outside Connecticut to the Monroe Fish Market, where he would supply others. The informant told Mercier that Ricca got his supply of cocaine from Sayball. Mercier

told Solomon that the informant's information was corroborated by a known and reliable informant who has in the past supplied information proven accurate by Monroe police department investigation and inquiries.

In December, 1982, Detective William Hughes of the Monroe police department received information from a confidential and reliable source, who had provided accurate information in the past, but was not in December speaking from personal knowledge, that Sayball was distributing cocaine of high quality. On December 31, 1982, surveillance of the Monroe Fish Market disclosed that a 1980 Ford pick-up truck registered to Condor, Inc., was at the Monroe Fish Market. A Greenwich police department narcotics officer, Frank Garr, told Solomon that Condor, Inc., or "The Condor," was known to the Greenwich police department as a tug boat business. Garr had been told by federal agents of the United States Customs Service and of the United States Coast Guard that The Condor was suspected of drug smuggling in Long Island Sound.

In January, 1983, Mercier and Solomon interviewed a confidential source who had given information in the past which had led to at least one arrest and conviction. This source, who lives near Sayball, told Mercier and Solomon that on several occasions in the previous several months he had seen, in the early morning hours of various days of the week, including Saturdays and Sundays, excessive traffic of campers, vans, pick-up trucks and passenger cars pull to the top of Sayball's driveway and back to the rear of a barn located at the rear of Sayball's property. Another confidential source who lives in the same general area confirmed these activities.

On October 1, 1983, Solomon received from a federal drug enforcement administration (DEA) agent, Dale J. Seymour, copies of telephone toll call records

for Sayball's telephone at his residence, and for one of the telephones at the Monroe Fish Market. These were for the period of January 17, 1983, through July 15, 1983. Seymour had obtained federal court orders on September 16, 1983, and September 27, 1983, to install pen registers[1] for Sayball's residence phone and for the two phones used at the Monroe Fish Market. Also, on September 30, 1983, Solomon received from the same DEA agent copies of telephone toll call records for the residence and business of Edward Lipnickas, Jr., for the period of March 19, 1983, through August 19, 1983. It is the information disclosed from an analysis of these toll records and pen register tapes which form much of the factual underpinning of the question of probable cause in this case.

For a clearer understanding of the import of the toll call and pen register information, we have chosen to divide the information according to the persons and establishments indicated by the toll call data and the pen register as having been called by and as having called the Sayball business and residence telephones.

### EDWARD LIPNICKAS, JR.

During the period January 17, 1983, through July 15, 1983, there were seven calls from Sayball's residence to the residence of Edward Lipnickas, Jr., in Milford, and nine calls from Sayball's residence to the New World Pet Shop, in Milford, owned and operated by Lipnickas. From March 19, 1983, through August 19, 1983, there were ninety-six calls from Lipnickas' resi-

---

[1] A pen register is a mechanical device, usually installed at a central telephone facility, which records on a paper tape all the telephone numbers dialed from the telephone line to which it is attached. It does not record the contents of the actual conversations involved in the calls. The fourth amendment does not apply to a pen register because a telephone user has no legitimate expectation of privacy in the information which it gathers and supplies. *Smith* v. *Maryland,* 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979).

dence and business to Sayball's residence and business. Lipnickas was previously convicted of possession of cocaine with intent to sell and possession of marihuana, based on a seizure from him and his apartment on February 19, 1979, by the Bridgeport police department, of 1.4 ounces of cocaine and 8.96 ounces of marihuana.

A confidential and reliable informant of a Milford police department drug officer told Sergeant Gerald Hanahan and Detective William Tripp on March 18, 1983, that Lipnickas was actively involved in selling cocaine from his pet shop. The Milford police department told Solomon that the informant personally saw Lipnickas and his wife cutting and packaging cocaine at their Milford residence, and that he had been at the pet shop when Lipnickas had sold cocaine to persons.

### BENJAMIN F. RALSTON, JR., THE DEFENDANT

From January 17, 1983, through July 15, 1983, twenty-five calls were made from Sayball's residence to Auto-Technics, Inc., in Norwalk, owned and operated by Ralston. From September 29, 1983, through October 4, 1983, twelve calls were made from Sayball's telephones to telephone facilities of Ralston. Ralston was previously convicted of possession of cocaine, based on an October 19, 1980 arrest in Trumbull in which he was found in possession of approximately one ounce of cocaine.

On September 2, 1983, Detective James Adams, a narcotics officer with the Norwalk police department, told Solomon that in August, 1983, a confidential and reliable informant bought cocaine from Ralston at his place of business in Norwalk. Adams said that he was in the informant's presence when the informant called Ralston, and that he overheard Ralston tell the informant that Ralston would not sell him any more cocaine until the informant paid for the cocaine already sold

to him by Ralston. The informant also related to Adams that Ralston said that he had a limitless source of drugs. The informant said that he could purchase drugs from Ralston either at his home or at his place of business. Surveillance of Sayball at his residence during the period of January, 1983, through August, 1983, disclosed either Sayball or his wife, Norma Sayball, operating a Lincoln automobile registered to Ralston's business, Auto-Technics, Inc.

## JOHN L. UBERTI

During the period January 17, 1983, through August 15, 1983, there were ninety-five calls from Sayball's residence to the residence of John L. Uberti in Milford and three calls from the Monroe Fish Market to Uberti's residence. From September 29, 1983, through October 4, 1983, there was one call from Sayball's telephone facilities to a telephone facility of Uberti. On October 4, 1982, Uberti had been arrested by the Connecticut state police on a charge of possession of narcotics with intent to sell, and was subsequently convicted of illegal possession of a controlled substance.

## CARL A. WILLSEY

During the period January 17, 1983, through July 15, 1983, there were eighteen calls from Sayball's residence to a telephone listed to Carl A. Willsey Co., in Greenwich. On January 19, 1973, Carl A. Willsey had been convicted of sale of narcotics and of aiding and abetting the sale of narcotics.

## FRANCIS SCARANO

From January 17, 1983, through July 15, 1983, there were seventy-two calls from Sayball's residence to the telephone facility of Francis Scarano in Meriden, and four calls from the Monroe Fish Market to the same telephone facility of Scarano. From July 29, 1983,

through October 4, 1983, there were three calls from Sayball's telephone facilities to Scarano's telephone facility.

DEA intelligence reports provided to Solomon indicated that Scarano was believed to be involved in narcotics trafficking in Connecticut. Intelligence reports in 1982 indicated that Scarano was flying cocaine into the Meriden airport from Canada. DEA investigation confirmed that Scarano had an airplane at the Meriden airport. Surveillance of the Monroe Fish Market, by Detective Hughes, at 6:30 p.m. on September 7, 1983, disclosed a motor vehicle, registered in New Hampshire to Scarano, parked in front of the Monroe Fish Market; the same vehicle was observed at Sayball's residence on September 23, 1983, at 5:40 p.m.

### MICHAEL J. DESMOND

From January 17, 1983, through July 15, 1983, there were 134 calls from Sayball's residence to the residence of Sarah Desmond and Michael J. Desmond, her husband, in Stamford, Connecticut, and three calls from the Desmond residence to the Monroe Fish Market. From September 29, 1983, through October 4, 1983, there were five calls from Sayball's telephone to telephone facilities registered to Sarah Desmond. Michael Desmond operates "The Condor" tugboat operation.

DEA had suspected Michael J. Desmond of drug smuggling since early 1979, as the then owner of the vessel, "Stor Fisk." Surveillance on September 14, 1983, between 3:30 and 4:30 p.m. at Sayball's residence in Monroe disclosed a Toyota automobile. The Toyota was registered to Sarah Desmond at a post office box address listed to both Sarah and Michael J. Desmond.

### MARK RICCA

On September 9, 1983, Solomon interviewed a confidential source made known to him by the confiden-

tial source earlier described as a reliable and upstanding citizen. This source told Solomon the following: During the two year period of 1980 and 1981, the source knew Sayball, also known as "Raccoon," who operated the Monroe Fish Market. The source was present on several occasions when Mark Ricca, who then lived in Fairfield, obtained cocaine from Sayball at the Monroe Fish Market, and was present on several occasions when Ricca made telephone calls to the Monroe Fish Market, spoke with Sayball, and then went with Ricca to the Monroe Fish Market where Ricca bought cocaine from Sayball. The source was present on a few occasions during the same period when Ricca called Sayball at his residence in Huntington, Connecticut, at that time, and this source accompanied Ricca to Sayball's residence in Huntington after the telephone calls and saw Ricca obtain cocaine from Sayball. The land records of Monroe indicate that Sayball bought his Monroe residence in September, 1981. The Connecticut motor vehicles department records indicate that during the period the source reported being in Sayball's house in Huntington, Sayball had motor vehicles registered to himself at 111 Mohegan Road, Huntington, Connecticut.

### FREDERICK CAVUOTO

From September 29, 1983, until October 4, 1983, there were twenty-nine calls from Sayball's telephone facilities to a telephone facility of Frederick Cavuoto in Trumbull. Cavuoto is presently charged with conspiring to sell cocaine and possession of cocaine, having been arrested on February 29, 1980, by the Connecticut state police. Federal Bureau of Investigation records show that Cavuoto was convicted in 1979 in federal court in Florida with conspiracy to smuggle marihuana. DEA records indicate that Cavuoto is considered a major cocaine trafficker in southwestern Connecticut.

On or about February 15, 1982, Solomon was notified by Investigator Robert Jones of the Bristol County, Massachusetts, District Attorney's office that a confidential and reliable informant had told that office that a "mother ship" was going to off-load marihuana in Bridgeport in the very near future. The informant was told by Patrick Menillo, Jr., that it would be off-loaded at a Bridgeport dock where a seafood market was located and that the dock was controlled by people associated with the smuggling venture. The informant also said that the load would then be stored in a barn behind an individual's house, north of Bridgeport, who was in the fish business and who was directly involved in the smuggling venture. The town of Monroe is north of Bridgeport, and Sayball's residence in Monroe has a barn behind it. Solomon's investigation indicated that the dock involved was used by associates of the Capoziello family, some of whom have been associated with Sayball. Menillo had been convicted in 1975 with Cavuoto of conspiring to smuggle large quantities of marihuana into the United States from Jamaica.

### LEONARD BENTON, ALSO KNOWN AS LEONARD CAPOZIELLO

DEA has documented Leonard Benton, also known as Leonard Capoziello, as a close associate of DEA fugitive and convicted marihuana smuggler Daniel C. McGuinness. The pen register disclosed a telephone call to Benton's residence from Sayball's residence on October 1, 1983. Surveillance disclosed that Sayball frequently drove vehicles registered to Benton's car rental agency, and vehicles registered to Benton's agency were observed at the Monroe Fish Market and at Sayball's residence.

### II

We first address the proper scope of review of the wiretap order of the panel, because in this case that

scope of review is determinative of the principal issue, namely, whether Solomon's affidavit established the requisite probable cause. The applicable scope of review of a wiretap order has been clearly stated by our Supreme Court: "[A] reviewing court should examine the information that was before the issuing panel and determine whether there was a substantial basis for the wiretap panel's finding of probable cause in accordance with our statutes. The deference to be accorded to the wiretap panel cannot be interpreted to mean that an order of that panel is insulated from meaningful review. The principle of great deference is properly applied to uphold the granting of an order by the wiretap panel where the reviewing court concludes, based upon its analysis of the record before the panel, that it is faced with a situation which it finds doubtful or marginal. Just as the wiretap panel 'must not merely serve as a rubber stamp for the police'; see *State* v. *DeChamplain,* [179 Conn. 522, 528, 427 A.2d 1338 (1980)]; *State* v. *Rose,* 168 Conn. 623, 627, 362 A.2d 813 (1975); a reviewing court must itself be satisfied that the facts set forth in the affidavit relied upon establish probable cause." *State* v. *Ross,* 194 Conn. 447, 459–60, 481 A.2d 730 (1984). The principle of great deference in a marginal case, which applies to warrants generally, is particularly appropriate under our statutory wiretap scheme, because we review the decision to issue the wiretap order, not of one judge, but of a panel of three judges.

Although the trial court determined that the applications and affidavits did not establish probable cause, or at least that they were not sufficiently close to the mark to invoke the "great deference" normally accorded to warrants; *State* v. *Jackson,* 162 Conn. 440, 445, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972); our independent review of them leads us to a different conclusion. Our

"analysis of the record before the panel" convinces us that we are "faced with a situation which [we find] doubtful or marginal." *State* v. *Ross,* supra, 460. In such a situation, "[t]he principle of great deference is properly applied to uphold the granting of [the] order by the wiretap panel . . . . " Id., 459–60.

### III

*State* v. *Ross,* supra, 463, also made clear that the proper test for evaluating whether an affidavit establishes probable cause for the issuance of a wiretap order is "the so-called *Aguilar-Spinelli* test; *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969)." That test requires that the affidavit disclose " '(1) some of the underlying circumstances relied on by the person providing the information to the affiant; and (2) some of the underlying circumstances from which the affiant concluded (a) that the informant, whose identity need not even be disclosed, was credible, or (b) that his information was reliable.' " *State* v. *Ross,* supra, 463 n.14.

When an affidavit contains hearsay, or, as in the case of some of the informants here, hearsay upon hearsay, the magistrate issuing the wiretap order must " 'determine whether it can be reasonably inferred "that the informant had gained his information in a reliable way." The magistrate must canvass the affidavit and the informer's tip as a whole and measure it against *Aguilar* standards in order to assess its probative value.' " Id., 464–65. Lack of circumstances indicating an informant's basis of knowledge "may be overcome by the presence of other factors such as corroboration of the information by the police, the existence of a declaration against penal interest, or reputation and past criminal behavior which could form a substantial basis for crediting hearsay. . . . " Id.,

465–66. Dovetailing of information from different sources also supplies corroboration. *State* v. *Kimbro,* 197 Conn. 219, 232, 496 A.2d 498 (1985). Additionally, an informant's "track record" of having supplied information in the past which led to an arrest or conviction is an indication of his reliability. Id.

Finally, the affidavit must be read "in a common sense manner" to determine whether it establishes probable cause. *State* v. *Ross,* supra, 468. "Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony has been committed." *State* v. *Middleton,* 170 Conn. 601, 604, 368 A.2d 66 (1976). This "well-established definition" specifically applies to wiretap cases. *State* v. *Ross,* supra, 459. The ultimate question for the issuing magistrate is: " 'Was this suspect probably involved in criminal activity?' " *State* v. *Jackson,* supra. The issuing magistrates, moreover, are not confined to the literal terms of the affidavit, but, in exercising their independent judgment, may draw reasonable inferences from those terms. Id., 444.

IV

With these principles in mind, we turn to the primary issue in this case, namely, whether Solomon's affidavit established "probable cause to believe that: (1) An individual has committed or is committing" the offense of illegal sale of narcotics or controlled substances; General Statutes § 54-41d (1); as a basis for the issuance of the wiretap order. The application and affidavit posit a continuing scheme of illegal sale of drugs by Sayball involving his place of business, the Monroe Fish Market, his residence on Old Newtown Road in Monroe, and the telephones at those locations. This information came from two sources, neither of which, standing

alone, met the *Aguilar-Spinelli* test. The first source was the purported upstanding citizen who had passed on to Mercier information, which was given to him by someone with personal knowledge, that Sayball was transporting cocaine from outside Connecticut to his fish market, where he would supply others. The second came from a purported confidential and reliable source who, not speaking from personal knowledge, told Hughes that Sayball was distributing cocaine of high quality.

We, therefore, examine Solomon's affidavit to determine whether probable cause as to Sayball's involvement in such a scheme was established by information disclosing (1) some of the underlying circumstances relied on by the persons supplying the information to Solomon, and (2) either (a) that the informants were credible, or (b) that the informants' information was reliable. We note in this connection that it is not necessary that all the information listed in the affidavit meet this test. As long as one or more of the informants, taken singly or together, establish probable cause as gauged by *Aguilar-Spinelli*, the affidavit is sufficient to justify issuance of the wiretap order.

## A

The first prong of the test is met by the marginal but sufficient information pertaining to Ricca, the unusual traffic at Sayball's house, and the involvement of the defendant. The informant, who tied Sayball and Ricca together in a drug-selling scheme in 1980 and 1981, disclosed to Solomon that he was speaking from personal observation. See *State* v. *Telesca,* 199 Conn. 591, 602–603, 508 A.2d 1367 (1986). This informant was present on several occasions when Ricca obtained cocaine from Sayball at the market and at Sayball's home which he claimed was then in Huntington, Connecticut. He was also speaking from personal obser-

vation when he disclosed that Ricca arranged these illicit transactions by telephone calls to the market and to Sayball's then residence. Furthermore, this informant's information was corroborated, in part at least, by reference to the public land and motor vehicle records which indicated that Sayball lived in Huntington during that time period.

Another confidential source was interviewed by Solomon and Mercier in January, 1983. This source was speaking from personal observation when he reported excessive amounts of motor vehicle traffic entering Sayball's driveway during the early morning hours of various days of the week, including Saturdays and Sundays. Furthermore, the credibility of this informant was sufficiently established by his track record of having previously given information which led to an arrest and conviction.

A third confidential informant gave information to Solomon through Norwalk narcotics officer Adams which linked Sayball to the defendant in a drug selling scheme. This informant related that in August, 1983, he bought cocaine from the defendant at his Norwalk place of business. This information disclosed the underlying circumstances relied on by Adams and Solomon, namely, the informant's first-hand participation in the transaction. Adams overheard the defendant confirm that he had sold drugs to the informant. The informant's reliability was further corroborated by his declaration against penal interest to Adams that he had bought cocaine from the defendant at the defendant's place of business. The informant also told Adams that the defendant claimed to have a limitless source of drugs. The defendant was linked to Sayball by surveillance for the period of January, 1983, through August, 1983, indicating that Sayball or his wife operated an automobile registered to the defendant's business, and by the numerous telephone calls between Sayball's busi-

ness and residence and the defendant's telephone facilities, including twelve such calls in the period of September 29, 1983, through October 4, 1983.

## B

The second prong of the *Aguilar-Spinelli* test is established, again marginally but sufficiently, principally through the information disclosed by the toll call records and pen register tapes, and by the permissible inferences arising therefrom. This information supplied a sufficient corroborating basis for the critical inference drawn by the wiretap panel, namely, that the various informants' statements indicating that Sayball was involved in a continuing drug selling scheme at his home and business, were reliable. This information is as follows.

From January 17, 1983, through August 19, 1983, there were a total of 112 telephone calls between Sayball and Lipnickas. Lipnickas had been convicted of possessing cocaine and marihuana. There was also first-hand, albeit uncorroborated, information from an informant that Lipnickas was actively selling cocaine. From January 17, 1983, through October 4, 1983, there were thirty-seven calls from Sayball to the defendant. The defendant had been convicted of possession of cocaine. Furthermore, there was reliable information, described above, that the defendant was selling cocaine, and that he claimed to have a limitless source of drugs. From January 17, 1983, through October 4, 1983, there were ninety-six calls from Sayball to Uberti, who had been arrested for possession of narcotics with intent to sell and convicted of possession of a controlled substance. From January 17, 1983, through July 15, 1983, there were eighteen calls from Sayball to Willsey, who had been convicted of selling narcotics and aiding the sale of narcotics. From September 29, 1983, through October 4, 1983, there were twenty-nine calls from Say-

ball to Cavuoto. Cavuoto had been convicted of conspiracy to smuggle marihuana and was, at the time of the wiretap application, under arrest for possession of cocaine and conspiracy to sell cocaine. Thus, there were, from January 17, 1983, through October, 1983, a total of 292 telephone calls between Sayball, either at his business or home, and persons with serious drug convictions.[2]

The relevance of telephone calls between a wiretap target and persons with drug convictions, as corroboration of an otherwise uncorroborated informant's information, has not been addressed either by this court or by our Supreme Court. It has been recognized, however, in some federal cases as a legitimate basis for such corroboration. See, e.g., *United States* v. *Tehfe,* 722 F.2d 1114, 1116 (3d Cir. 1983); *United States* v. *Webster,* 639 F.2d 174 (4th Cir. 1981). In *United States* v. *Tehfe,* supra, the court relied for corroboration on the fact that "[p]en register records also revealed that calls, including one on January 10, 1983, were made from a telephone at [the defendant's] home to other drug dealers in the months before the request for a wiretap was granted." In *United States* v. *Webster,* supra, the court relied on toll call records disclosing that calls from the target telephone, when matched with DEA records of known and suspected drug traffickers, resulted in three such calls. See also *United States* v. *Lanza,* 341 F. Sup. 405 (M.D. Fla. 1972) (use of temporal pattern of telephone calls, derived from

---

[2] In addition, in the same general time period, there were a total of 222 telephone calls between Sayball and Scarano, Desmond and Benton, all of whom were suspected by DEA of being involved in drug smuggling. These suspicions were, however, essentially uncorroborated. We do not rule out the use in an appropriate case of such suspicions by federal drug officials, if sufficiently documented or at least partially corroborated, as additional material forming the basis of a probable cause determination. We do not, however, believe them to be necessary in this case. Therefore, we do not rule on the effect of such assertions in the affidavit in this case.

pen register, to persons whom probable cause established as engaging in illegal gambling enterprise). Legitimate reliance for corroboration on the prior convictions of the other parties to the telephone calls derives from the well established rule that one of the most common reliability factors is "the reputation and past criminal behavior of the suspect." *State* v. *Ferguson,* 185 Conn. 104, 113, 440 A.2d 841 (1981). Although all of these federal cases also had other corroborating circumstances stronger than in this case, it is also true that in none of these cases was there the extraordinarily high number of telephone calls to convicted drug offenders that is present in this case.

There was some further corroboration through the matching of the information supplied by the Massachusetts informant, whose reliability was not established, with that supplied by the reliable informant who described the excessive early morning traffic at Sayball's residence. The Massachusetts informant's information was that a load of smuggled marihuana was to be brought to a barn behind the house, north of Bridgeport, of a person in the fish business who was involved in the smuggling. The reliable informant's information described excessive early morning traffic backing up to Sayball's barn located behind his home in Monroe, which is north of Bridgeport. Corroboration results where information from different sources dovetails. *State* v. *Kimbro,* supra, 232, citing *State* v. *Jackson,* supra, 448.

Reading the entire affidavit in a common sense manner, applying the *Aguilar-Spinelli* test to its contents, and giving the decision of the issuing panel the great deference which, because this is a marginal case, it is due, we believe that it was a permissible inference that Sayball's nearly 300 calls, in a period of less than ten months, with convicted drug offenders were part of his role in the continuing drug selling enterprise which had

been described in the affidavit. We conclude, therefore, that probable cause existed for the issuance of the wiretap order.

## V

We next consider whether it was necessary that the affidavit establish probable cause as to this defendant. The defendant argues that the affidavit did not establish probable cause as to him and that, therefore, the wiretap evidence was properly suppressible as to him. We agree with the state, however, that there is no requirement that the affidavit establish probable cause as to all persons named in the application as probable conversers. Because probable cause was established as to Sayball, the interception of his conversations with the defendant, who was also named in the application as a person whose communications were to be intercepted, was permissible.

First, there is nothing in the statutory scheme or language to suggest that probable cause must be established as to all potential interceptees in order for a wiretap order to be valid. General Statutes § 54-41c (5) (D) requires that the application include "the identity of the person, if known, who has committed or who is committing the offense and whose communications are to be intercepted . . . ." General Statutes § 54-41d, which spells out the nine probable cause determinations which must be made by the wiretap panel, requires in subsection (1) only that there be probable cause that *"[a]n* individual has committed or is committing an offense enumerated in section 54-41b," which includes sale of cocaine. (Emphasis added.) Thus, this statutory distinction between the language of General Statutes §§ 54-41c (5) (D) and 54-41d (1) belies the defendant's argument. The defendant's interests are adequately protected in the statute by permitting him

to challenge the validity of the wiretap order upon a showing that he is an "aggrieved person." General Statutes § 54-41m.

Second, our wiretap statute has been interpreted, consistently with the federal wiretap act, to permit the overhearing of unnamed individuals who are parties to the conversation of named persons as long as the panel's order includes appropriate permissible language, such as " 'in conversations of others unknown,' or some clear equivalent thereto . . . . " *State* v. *Thompson,* 191 Conn. 360, 375, 464 A.2d 799 (1983), cert. denied, 465 U.S. 1006, 104 S. Ct. 999, 79 L. Ed. 2d 231 (1984). It would be a bizarre construction, indeed, to permit the interception of conversations of unnamed individuals, as to whom it may be unlikely if not impossible to establish probable cause, but to bar the interception of conversations of named probable conversers as to whom there is a quantum of information.

Third, this construction of our wiretap statute is consistent with federal cases construing essentially the same language in the federal wiretap statute. Neither the fourth amendment nor the federal statute require a showing of probable cause as to all persons named in the application as probable conversers, as long as probable cause is established as to one of them. *United States* v. *Martin,* 599 F.2d 880, 884 (9th Cir. 1979); *United States* v. *Kirk,* 534 F.2d 1262 (8th Cir. 1976); *United States* v. *Tortorello,* 480 F.2d 764 (2d Cir. 1973), cert. denied, 414 U.S. 866, 94 S. Ct. 63, 38 L. Ed. 2d 86 (1973); see Fishman, Wiretapping and Eavesdropping (1985 Sup.) § 50. We recognize that in some respects our statute is more stringent than the federal act; see, e.g., *State* v. *Formica,* 3 Conn. App. 477, 483–84, 489 A.2d 1060, cert. denied, 196 Conn. 806, 494 A.2d 903 (1985); but we see nothing in our legislative scheme or its history, which we have examined,

to suggest that this is one of those situations. Indeed, the pertinent judicial gloss on our statute suggests that, in this respect, our statute should be read consistently with the federal act. *State* v. *Thompson,* supra.

The defendant's reliance on *United States* v. *Donovan,* 429 U.S. 413, 97 S. Ct. 658 , 50 L. Ed. 2d 652 (1977), is misplaced. In that case, the Supreme Court held that, pursuant to the federal wiretap statute, the government must name in its application any individual it has probable cause to believe is engaged in the investigated criminal activity and whose conversations it expects to overhear. It did not decide, nor has any other case brought to our attention, that the government must establish probable cause as to any individual so named in order for the wiretap order to be valid against that individual.

## VI

The final question involves the meaning of General Statutes § 54-41c (7), which provides in pertinent part: "No order authorizing or approving the interception of a wire communication shall be issued if the facts and circumstances relied upon by the applicant were discovered more than twenty days next preceding the date of the application." Admittedly, much of the information in the affidavit was known to the the law enforcement agencies long beyond the twenty day period. It is also true, however, that it was within the twenty day period preceding the date of the application that further information was discovered which, taken together with the earlier information, permitted a finding of probable cause and thus permitted a wiretap order to issue. It is not necessary in this case to define the precise contours of the meaning of the statutory provision at issue here. We conclude that, at least where the application and affidavit indicate a continuing course of criminal activity, as they do here, the twenty day

statutory rule is not violated if the finding of probable cause rests on facts and circumstances discovered within the period in addition to facts and circumstances discovered beyond the period.

A statute, even one which has been held to be subject to strict construction; *State* v. *Formica,* supra, 481; must be read with common sense, so as to accomplish a reasonable result and not to thwart its purpose. *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983). It cannot be denied that one of the principal purposes of our statutory scheme is to permit wiretaps where there is probable cause to believe that an individual is illegally selling a drug such as cocaine. See General Statutes §§ 54-41d (1), 54-41b and 21a-277.

Probable cause is not ordinarily produced as one piece of precast concrete. It is a "mosaic"; *State* v. *Abbott,* 5 Conn. App. 441, 445, 499 A.2d 437 (1985); which is established by fitting pieces of information together so that they can ultimately convince a magistrate that there is " 'a fair probability [of] proscribed activity' . . . . " Id., 446.

The illegal sale of drugs is a criminal activity which is not necessarily confined to a twenty day period, as if it were inherently akin to the traditional Thanksgiving-to-Christmas retail sales period. It often, as was shown in this case, involves a course of conduct which continues over a long period of time. *State* v. *Burgos,* 7 Conn. App. 265, 271, 508 A.2d 795 (1986). It would be an unreasonable construction of General Statutes § 54-41c (7), would thwart its purpose, and would be inconsistent with the nature of the process of establishing probable cause, to hold that none of the information discovered beyond the twenty day period could be used to establish probable cause for a wiretap aimed at ferreting out evidence of a continuing course of illegal drug selling.

Although the legislative history of our twenty day rule is scant and offers little illumination on the precise issue here, that history does indicate a legislative concern that wiretap orders not issue based on stale information. See 14 S. Proc., Pt. 2, 1971 Sess., p. 834. Thus, we can reasonably read General Statutes § 54-41c (7) as an additional attempt to implement the constitutional staleness principle. We have recognized, under that principle, that "[o]ther material in the affidavit may supplement and bring down to date the earlier materials . . . . " *State* v. *Abbott,* supra, 445.

The federal wiretap statute has no analog to our twenty day rule. Under that scheme, the only pertinent inquiry is whether the information in the affidavit is sufficiently fresh to meet federal constitutional limitations on staleness. *United States* v. *Martino,* 664 F.2d 860, 867 (2d Cir. 1981). "Where the supporting affidavits present a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant." Id., 867. Thus, our reading of the twenty day rule, which does not preclude resort to older information in a case involving ongoing criminal activity, is consistent with the federal constitutional staleness principle.

There is error, the judgment granting the motion to suppress and dismissing the information is set aside, and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.