STATE OF CONNECTICUT v. HERBERT BROWN
(5268)

DUPONT, C. J., BORDEN and FOTI, Js.

Argued January 13—decision released June 14, 1988

*William Holden,* public defender, with whom, on the brief, were *Michael Jachimczyk, Diane Sweeney, Mark Buebendorf* and *John Anderson,* certified legal interns, for the appellant (defendant).

*C. Robert Satti, Jr.,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals from the judgment of conviction, following his conditional plea of nolo contendere, of conspiracy in violation of General Statutes § 53a-48, and of unlawful possession of cocaine with intent to sell or dispense in violation of General Statutes § 21a-277 (a). The defendant's plea followed the denial by the trial court of his oral motion to suppress evidence gathered pursuant to a search warrant for the search of his home,[1] and the denial of his written motion dated July 30, 1985, to suppress the contents of an intercepted wire communication.[2]

The principal issues on this appeal are (1) whether the search warrant for the defendant's home was supported by probable cause, (2) whether there is a good faith exception to the exclusionary rule under Connecticut law, and (3) whether the requirement of General Statutes § 54-41k that an inventory be served "on persons not named in [a wiretap] order or application whose communications were intercepted" can only be complied with by personal service. We find no error.

On June 8, 1984, Senior Inspector John Solomon, of the division of criminal justice of the state, and Detective Paul Lengyel, of the Bridgeport police department,

---

[1] The record discloses a written "Motion to Dismiss and Suppress," dated June 29, 1984, on which no action was taken by the court. It is clear, however, from the court's oral memorandum of decision that it was acting in response to an oral motion to suppress made by the defendant.

[2] The record also discloses the following written motions directed to wiretaps, all of which were denied: a motion to suppress dated December 3, 1985; a motion to suppress dated December 12, 1985; and a supplemental motion to suppress dated March 12, 1986. Only the written motion to suppress dated July 30, 1985, referred, however, to the claim which the defendant presses on appeal, namely, that the post-intercept requirements of General Statutes § 54-41k were not met.

applied for and secured from a Superior Court judge a search and seizure warrant for the defendant's person and for his residence located at 487 Woodlawn Avenue, Bridgeport. The warrant was executed on the same day. The fruits of that search are the subject of the defendant's oral motion to suppress.

The affidavit of Solomon and Lengyel supporting their application was based in part on the results of certain telephone wiretaps authorized by a panel of Superior Court judges pursuant to chapter 959a of the General Statutes; General Statutes §§ 54-41a through 54-41t; our wiretapping and electronic surveillance statute. Those wiretaps were authorized for certain telephones located at 1477 Central Avenue, Bridgeport, the residence of Jean Lanham, and for certain telephones located at 147 Trumbull Avenue, Bridgeport, the residence of Butch Hall. The affidavit of Solomon and Lengyel described certain intercepted telephone calls from Lanham and Hall's telephones to a certain telephone or telephones purportedly located at the defendant's Woodlawn Avenue residence, in which the defendant's conversations were intercepted. The defendant was sent, by certified mail, a timely inventory pursuant to General Statutes § 54-41k notifying him that his conversations had been intercepted.

The defendant moved to suppress the evidence gathered as a result of the search of his residence. The basis of his motion to suppress was that the warrant was insufficient under both the federal and state constitutions because it was not supported by probable cause. The state argued that there was probable cause for the warrant, and, in the alternative, that the exclusionary rule should not apply because the officers acted in good faith reliance on the warrant. With respect to the defendant's motion to suppress his intercepted conversations, the defendant claimed that he did not

receive the inventory of the wiretap. The state claimed that he did receive the inventory sent to him by certified mail.

After a full evidentiary hearing, the trial court ruled that (1) the warrant was not supported by probable cause, but (2) the good faith exception to the exclusionary rule applied under the state as well as the federal constitution, and the state had established good faith, and (3) the defendant did receive the inventory sent to him pursuant to General Statutes § 54-41k. Following the defendant's conditional plea of nolo contendere pursuant to General Statutes § 54-94a, judgment of conviction was rendered. This appeal followed.

# I
## THE SUFFICIENCY OF THE AFFIDAVIT

The defendant first claims that the trial court erred in denying his motion to suppress the evidence yielded by the search pursuant to the warrant. He argues (1) that General Statutes § 54-33f and Practice Book §§ 821 and 822 require suppression of unlawfully obtained evidence without regard to the good faith of the officers executing the search, and (2) that article first, § 7, of the Connecticut constitution does not contain a good faith exception to the exclusionary rule. The state first responds by claiming that we need not reach those issues because the trial court erred in ruling that probable cause was lacking. Thus, the state presents this claim as an alternate ground upon which to affirm the judgment of the trial court. Practice Book § 4013 (a) (1). We therefore first consider whether the affidavit supporting the search warrant established probable cause. We conclude that it did.

The first eighteen paragraphs of the affidavit disclose the following facts: Solomon and Lengyel are experienced law enforcement officers, with a total of thirty-

three years of police experience including numerous investigations of crimes involving the illegal sale of narcotics. In March, 1984, Solomon and another law enforcement officer met with a confidential informant, whose reliability was established by several prior incidents in which he gave information leading to arrests for illegal sale of narcotics and to seizure of narcotics. This informant told the officers that he had personal knowledge that Butch Hall, a black male approximately forty-five years old, who resided at 147 Trumbull Avenue, Bridgeport, was conducting a large-scale narcotics operation with several persons under his control, and that those persons were receiving cocaine from Hall. He also reported that Jean Lanham, Hall's girlfriend, resided at apartment 9-C, 1477 Central Avenue, Bridgeport, where she was actively involved in selling narcotics for Hall. The informant stated that he had been in Lanham's apartment several times with Hall and Lanham, where he observed cocaine and large sums of money in their possession. The informant also stated that between January 1, 1984, and May 1, 1984, he bought narcotics from either Lanham or Hall on several occasions at Lanham's apartment.

On April 12, 1984, Lengyel met with another confidential informant whom Lengyel had known for approximately ten years. This informant's reliability was established by the fact that in the past he had supplied Lengyel with information leading to arrests and convictions for crimes involving the illegal sale of narcotics. This informant stated that he had personal knowledge that Hall was a major source of narcotics in the Bridgeport area and that he had several other persons dealing for him. The informant reported that Hall operates his drug operation from his house, located at 147 Trumbull Avenue, Bridgeport, and from the apartment of his girlfriend known as "Jean," on Central Avenue, Bridgeport. The informant stated that he

had bought cocaine on several occasions in Hall's residence at 147 Trumbull Avenue.

The affidavit also disclosed that on May 15, 1984, a three judge panel authorized wire interceptions over telephone facility "(203) 336-8287, located in the apartment of Lanham, apartment 9-C, 1477 Central Avenue." Between May 15, 1984, and June 7, 1984, Solomon and other law enforcement officers intercepted numerous incoming and outgoing telephone calls over that facility which were determined to be drug related calls pertaining to the sale of cocaine. Without detailing further the contents of this part of the affidavit, it is clear from the intercepted phone calls on May 22, 1984, and May 23, 1984, and from subsequent surveillances made by law enforcement officers, that there was probable cause to believe that Lanham's apartment and telephone were used by Lanham and Hall as a location for the sale of cocaine.

On May 29, 1984, a three judge panel authorized a wiretap of the telephone facilities (203) 372-4264 and (203) 372-9701, both located at the residence of Hall located at 147 Trumbull Avenue. On May 30, 1984, Solomon and another law enforcement officer began intercepting telephone calls over these facilities. They determined that several incoming and outgoing calls pertained to the sale of narcotics.

To this point in the affidavit, the defendant was not mentioned. The next five paragraphs of the affidavit provide the basis for the determination of probable cause that the defendant was violating or conspiring to violate the narcotics laws at his residence located at 487 Woodlawn Avenue, Bridgeport.

Paragraph nineteen recited that on May 30, 1984, at 9:17 p.m. an outgoing call from Lanham's phone, (203) 336-8287, was made to telephone facility (203) 371-4251, which "The Southern New England

Telephone Company records indicate . . . is located at 487 Woodland Avenue, Bridgeport, the subscriber being one Herbert Brown," the defendant. The wiretap revealed that the conversation was between Hall's daughter, Shonda, and "Herb," and between "Jean" and "Herb." Both Shonda and Jean were looking for Hall at 487 Woodlawn Avenue.

Paragraph twenty stated that on June 1, 1984, at approximately 8:04 a.m., an outgoing call from Hall's residence was intercepted, disclosing a conversation between Hall and "Herb."

Paragraph twenty-one stated that on June 2, 1984, at 10:21 p.m., an outgoing call was intercepted over telephone facility (203) 372-9701, "which The Southern New England Telephone Company also lists as being located at 147 Trumbull Avenue, Bridgeport [Hall's residence] to telephone facility (203) 371-4874 which is located at 487 Woodlawn Avenue, Bridgeport. The conversation being between an unknown female and Butch. Butch tells her 'he didn't want anyone to know where he was at.' "

Paragraph twenty-two stated that on June 2, 1984, at approximately 6:48 p.m. an outgoing call was intercepted from telephone facility (203) 372-4264, one of Hall's telephones located at 147 Woodlawn Avenue. The conversation was between Hall and "Herbert." The contents of the call were that Hall needed Herbert because a "Russell" wanted to come to Woodlawn Avenue in a few moments "and we have to put something like we did last night." Hall told Herbert that "there's a nice P.C. in it for Herbert," and that Hall wanted to come to Herbert's house "and bring Doc with him." They then agreed that Herbert would come to Hall's house right away. Solomon and Lengyel stated in the affidavit that "Doc" was Michael Cooper, who worked for Hall in the narcotics operation, and that "Russell" was Russell Shields, who buys narcotics from Hall.

Paragraph twenty-three stated that on June 2, 1984, at 11:31 p.m., an outgoing call was intercepted from Hall's house "to telephone facility (203) 371-4874 located at Herbert's house. This call being from Janet to Butch." The contents of the call were in a code similar to the previous calls. Solomon and Lengyel interpreted the code as follows: Janet was making an $8000 purchase of narcotics for a male who had only $800, but Hall agreed to this, and Hall would send Herbert to Hall's house with the narcotics.

Paragraph twenty-four stated that on June 4, 1984, at 9:45 p.m., an outgoing call was intercepted from Hall's house "to telephone facility (203) 371-4874, Butch to Herbert telling him to bring his three-way thing over there. Herbert informs Butch that he's on his way." Solomon and Lengyel interpret this as follows: Herbert would bring his three-beam scale, which is commonly used to weigh narcotics, to Hall's house.

The affidavit concluded with the affiants' statement that they had "probable cause to believe that Herbert Brown is violating [General Statutes § 21a-277 (a),] Illegal Sale of Narcotics, and [General Statutes § 53a-48 (a),] conspiracy to violate [General Statutes § 21a-277 (a),] from the house that he uses which is located at 487 Woodlawn Avenue, Bridgeport, Connecticut." The issuing judge took the oaths of the affiants and issued a search warrant for a "one-family wood framed house with pinkish asbestos shingles, red roof located on the south side of the street. Designated by the number 487, Woodlawn Avenue, Bridgeport, Connecticut, and the person of a black male known to the affiants as Herbert Brown." The warrant authorized the seizure of, inter alia, "[n]arcotic substances, Cocaine, other controlled substances . . . drug paraphernalia . . . weapons and handguns commonly used for the protection of drug trafficking operations." The warrant was

executed on the same day, and yielded, inter alia, a considerable amount of cocaine, related drug paraphernalia, and a shotgun.

The defendant has challenged the sufficiency of the affidavit on state, as well as federal, constitutional grounds. We do not apply the totality of circumstances test established for federal constitutional purposes in *Illinois* v. *Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983), to determine whether the affidavit established probable cause. We have held that, under article first, § 7, of the Connecticut constitution, as interpreted by our Supreme Court in *State* v. *Kimbro*, 197 Conn. 219, 236, 496 A.2d 498 (1985), probable cause for a warrant must be established by the stricter *Aguilar-Spinelli* test. *State* v. *Garcia*, 7 Conn. App. 354, 357–58, 508 A.2d 824 (1986). Our Supreme Court has applied the *Kimbro* test to a search pursuant to a warrant. *State* v. *Morrill*, 205 Conn. 560, 534 A.2d 1165 (1987). Therefore, the search warrant affidavit can only pass muster if it meets that test, which is based on an analysis of two key factors: " '(1) the basis of the informant's knowledge—the means by which he acquired his information, and (2) the underlying facts establishing either his general veracity or his reliability in the particular case.' " *State* v. *Garcia*, supra, 358, quoting *State* v. *Martin*, 2 Conn. App. 605, 610, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985).

This test must be employed, moreover, together with certain principles generally applicable to the evaluation of search warrant affidavits. The affidavit must be read in a commonsense and realistic manner, and the issuing magistrate is not confined to its literal terms but may draw reasonable inferences therefrom. *State* v. *Ralston*, 7 Conn. App. 660, 673, 510 A.2d 1346, cert.

granted, 201 Conn. 808, 515 A.2d (1986). Although the affidavit must establish that there is probable cause to believe that the material sought is present " 'at that time' "; *State* v. *Abbott,* 5 Conn. App. 441, 444, 499 A.2d 437 (1985), quoting *Sgro* v. *United States,* 287 U.S. 206, 210–11, 53 S. Ct. 138, 77 L. Ed. 260 (1932); and at the place sought to be searched; *State* v. *DeChamplain,* 179 Conn. 522, 529–30, 427 A.2d 1338 (1980); " '[w]hether the proof meets this test must be determined by the circumstances of each case.' " *State* v. *Abbott,* supra, 444, quoting *Sgro* v. *United States,* supra, 210–11. The nature of the crime largely determines the duration of probable cause. *State* v. *Garcia,* supra, 358. A search warrant affidavit must establish a nexus between the premises to be searched and the object sought, and that nexus can be inferred from the type of crime involved, the material sought, the opportunity for concealment, and normal inferences drawn from the facts in the affidavit. *State* v. *Couture,* 194 Conn. 530, 536–37, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Where the crime is the illegal sale of drugs, it "is a criminal activity which is not necessarily confined to a twenty day period as if it were inherently akin to the traditional Thanksgiving to Christmas retail sales period. It often . . . involves a course of conduct which continues over a long period of time." *State* v. *Ralston,* supra, 682. Indeed, it is usually considered to be a regenerating activity. See *Donaldson* v. *State,* 46 Md. App. 521, 420 A.2d 281 (1980). Probable cause is a mosaic "established by fitting pieces of information together"; *State* v. *Ralston,* supra; which convinces the magistrate of a fair probability that the contraband is where it is alleged to be. Id. Finally, in reviewing the search warrant, we must give great deference to the decision of the issuing magistrate if the situation is doubtful or marginal. Id., 671.

Applying these principles to this affidavit, we conclude that the search warrant was validly issued. It is clear that the affidavit established probable cause to believe that Hall and Lanham were conducting an extensive operation for the sale of narcotics out of Hall's house and Lanham's apartment, and that others were involved with them in that operation. The basis of knowledge of each of the two confidential informants was adequately established to be his personal experience in viewing and buying drugs from Hall and Lanham at their residences. The reliability of each informant was adequately established by his track record, by his declarations against penal interests, and by corroboration of his information gained through the dovetailing of their information with other information yielded by the subsequent wiretaps and surveillance. We turn, therefore, to the question of whether paragraphs nineteen through twenty-four of the affidavit sufficiently tied the defendant and his residence into that operation, so as to establish probable cause that on June 8, 1984, the date of the affidavit, narcotics and related paraphernalia were located at the defendant's residence. A chain of several factors leads us to conclude that they do.

First, the information presented by Solomon and Lengyel in those paragraphs was derived from the intercepted conversations and their interpretations of those conversations. Thus, the affidavit reflected their own personal experience gained from the transcripts of the conversations, and their extensive professional experience which enabled them to interpret those conversations. In this connection, it has been recognized that drug dealers often speak in code over the telephone. *United States* v. *Cicale,* 691 F.2d 95, 104–105 (2d Cir. 1982), cert. denied, 460 U.S. 1082, 103 S. Ct. 1771, 76 L. Ed. 2d 344 (1983); *People* v. *DiNapoli,* 108 App. Div. 2d 650, 487 N.Y.S.2d 526 (1985) (Sullivan, J.,

dissenting). The reliability of Solomon and Lengyel was derived from their status as police officers. *United States* v. *Ventresca,* 380 U.S. 102, 111, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965).

Second, it is a reasonable inference that "Herbert," whose conversations with Hall were intercepted, is the defendant, Herbert Brown. Paragraph nineteen indicated that the telephone facility called by Hall's daughter on May 30, 1984, was registered to the defendant at 487 Woodlawn Avenue, and that Lanham, who also spoke to the same "Herbert" in the same conversation, was also looking for Hall. The subsequent intercepted telephone calls in which "Herbert" was overheard are clearly consistent with this conclusion.

Third, telephone calls from a drug dealer to another person may, depending on the circumstances, permit an inference that the other person is also engaged in the same enterprise. See *State* v. *Ralston,* supra, 677. Although in *Ralston* we relied on the high number of calls but not on their contents, in this case we have the contents of a lesser number of calls between Hall and the defendant indicating illegal drug activity.

Fourth, it is a reasonable inference that the intercepted telephone calls referred to in paragraphs nineteen through twenty-four were between Hall's residence and the defendant's residence. It is true that in paragraph nineteen Solomon and Lengyel stated that telephone records indicate that telephone facility (203) 371-4251 was registered at 487 Woodlawn Avenue. It is also true, moreover, that in paragraph twenty they state, without specific attribution to telephone company records, that telephone facility (203) 371-4874, a number different from that indicated in paragraph nineteen, was located at 487 Woodlawn Avenue. This does not mean, however, that there was no permissible basis for the judge to infer that telephone facility (203) 371-4874 was also registered to the defendant at that address.

Paragraph twenty-one reads in pertinent part as follows: "On the date of June 2, 1984, at 10:21 p.m. [an outgoing] call was intercepted being made from Telephone Facility (203) 372-9701 which The Southern New England Telephone Company also lists as being located at 147 Trumbull Avenue, Bridgeport [Hall's residence] *to telephone facility (203) 371-4874 which is located at 487 Woodlawn Avenue, Bridgeport.*" (Emphasis added.) Affidavits for search warrants "are normally drafted by nonlawyers in the . . . haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States* v. *Ventresca,* supra, 108. It was reasonable for the issuing judge to infer that the reference to the telephone company records regarding Hall's telephone facility 372-9701 also applied to the defendant's telephone facility, 371-4874. Thus, the issuing judge could have reasonably inferred that the defendant had two telephone facilities registered to him at his residence.[3]

Fifth, the affidavit disclosed three telephone calls on June 2, 1984, from Hall's residence to the defendant's residence. At approximately 6:48 p.m., Hall called the defendant from Hall's residence, and they discussed Cooper, who worked for Hall in his narcotics operation, and Shields, who bought narcotics from Hall. At 10:21 p.m., an unknown female at Hall's residence spoke to Hall at the defendant's residence, and Hall told her he did not want anyone to know where he was. At 11:31 p.m., Lanham called Hall at the defendant's residence, and Hall told Lanham that he would send the defend-

---

[3] There was testimony before the trial court that the reference in paragraph nineteen to telephone facility (203) 371-4251 was a typographical error. We must, however, "consider only the information that was actually before the issuing judge at the time he or she signed the warrant." *State* v. *Delmonaco,* 194 Conn. 331, 337, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984).

ant to Hall's residence with $8000 worth of narcotics in ten minutes. Furthermore, the affidavit disclosed a call on June 4, 1984, at 9:54 p.m. from Hall's residence to the defendant's residence in which the defendant told Hall that he was on his way to the defendant's residence with his three-beam scale. These last two calls provided strong information not only linking the defendant to Hall but linking the two in the context of the defendant's participation in illegal drug trafficking activities.

In sum, reading the entire affidavit in a commonsense and realistic manner, we conclude that it was reasonable for the issuing judge to find probable cause to believe that, during the period of May 30, 1984, through June 4, 1984, the defendant was connected with and participating in Hall's illegal narcotics operation, and that during that same period narcotics and other paraphernalia related to that operation were located at the defendant's house. That finding, in turn, permitted the further finding of probable cause to believe that, because of the ongoing and regenerating nature of illegal drug selling, the contraband was also there on June 8, 1984. Finally, any doubts about these inferences must be dispelled by the preference to be accorded warrants.

This case is distinguishable from *State* v. *DeChamplain*, supra. In *DeChamplain*, the court found a lack of probable cause to believe that drugs were located in the defendant's apartment, because the only facts establishing a nexus to the apartment was a single telephone call to the defendant at his apartment in which he received an order for the purchase of drugs. In this case, by contrast, there were several recent telephone calls to the defendant's house indicating drug activity there connected to a drug-selling scheme located elsewhere, and the final two calls indicated that the defendant would immediately be transporting a large amount of drugs

and drug paraphernalia from his house to the home of his principal in the scheme.

## II

## THE GOOD FAITH EXCEPTION TO THE EXCLUSIONARY RULE UNDER CONNECTICUT LAW

Under ordinary circumstances, a conclusion that the affidavit passed muster under the Connecticut constitution would render it unnecessary to decide the issue of whether there is a good faith exception to the exclusionary rule under Connecticut law, where a search is carried out pursuant to a search warrant. See *State* v. *Cates,* 202 Conn. 615, 624, 522 A.2d 788 (1987). In this case, however, we deem it appropriate to consider that issue, for several reasons.

Although we are confident of our conclusion regarding the sufficiency of the affidavit, we recognize that our conclusion is a close call and that upon further review, if sought and secured, it might not stand. Furthermore, the issue of the good faith exception was fully litigated and decided, both factually and legally, in the trial court, and the trial court's decision thereon was the basis of the defendant's appeal. Thus, there is a full appellate record upon which to consider the issue. Compare *State* v. *Zindros,* 189 Conn. 228, 254 n.32, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984), where the court eschewed addressing the issue of a good faith exception under the federal constitution in part because the record was inadequate. Finally, the issue was fully and ably briefed and argued in this court.

We therefore consider the defendant's claims of error addressed to the trial court's determination that the reasonable good faith of the police rendered the evidence admissible. We conclude, as an alternate but equal and independent basis of this decision, that under

Connecticut law, whether derived from the rules of practice, statute, or the constitution, evidence obtained pursuant to objectively reasonable reliance on a subsequently invalidated search warrant is admissible in the state's case-in-chief.

## A

### HISTORY OF THE EXCLUSIONARY RULE

In *Weeks* v. *United States,* 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), the United States Supreme Court held that the evidence obtained in violation of the fourth amendment to the United States constitution[4] was inadmissible in the government's case-in-chief in a federal prosecution. In *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), the Court held that the *Weeks* exclusionary rule applied to state prosecutions, rendering inadmissible in the state's case-in-chief evidence obtained in violation of fourth amendment standards.

Connecticut, however, was among those states that eschewed an exclusionary rule, as a matter of state constitutional law. Our Supreme Court, in its first post-*Mapp* decision, noted that "[i]t has long been the law in this state that evidence, although obtained by unlawful search and seizure [in violation of the state constitution], is, nevertheless, admissible in a criminal prosecution. *State* v. *Carol,* 120 Conn. 573, 575, 181 A. 714 [1935]; *State* v. *Reynolds,* 101 Conn. 224, 231, 125 A.636 [1924]; *State* v. *Magnano,* 97 Conn. 543, 546, 117 A. 550 [1922]; *State* v. *Griswold,* 67 Conn. 290, 306, 34 A. 1046 [1896]." *State* v. *DelVecchio,* 149 Conn. 567, 572, 182 A.2d 402 (1962).

---

[4] The fourth amendment to the constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Since *Mapp,* the United States Supreme Court has clarified the nature and purpose of the exclusionary rule. The rule is not a necessary corollary of the Fourth Amendment; it operates as "a judicially created remedy designed to safeguard fourth amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States* v. *Calandra,* 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). Its purpose is to deter illegal police conduct. *Stone* v. *Powell,* 428 U.S. 465, 482–89, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976); *United States* v. *Janis,* 428 U.S. 433, 446, 96 S. Ct. 3021, 49 L. Ed. 2d 1046 (1976). Our Supreme Court and this court have explicitly recognized this as the purpose of the exclusionary rule. *State* v. *Zindros,* supra, 253 (rule designed to deter future unlawful police conduct and therefore effectuate fourth amendment guarantee against unreasonable searches and seizures, not to vindicate individual's constitutional right); see also *State* v. *Surowiecki,* 184 Conn. 95, 101, 440 A.2d 798 (1981) (*Shea, J.* dissenting) (deterrence of unlawful police conduct the only rational justification for exclusionary rule); *State* v. *Cooper,* 9 Conn. App. 15, 27, 514 A.2d 758 (1986) (purpose of exclusionary rule is deterrence of police misconduct and removal of inducement to unreasonable invasion of privacy).

In *United States* v. *Leon,* 468 U.S. 897, 905, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), the United States Supreme Court considered the admissibility of evidence obtained by the police acting in reasonable good faith reliance on a search warrant which was subsequently held deficient and it explicitly recognized that "[w]hether the exclusionary sanction is appropriately imposed in [such] a . . . case . . . must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy and tangible evidence obtained in reliance on a search

warrant issued by detached and neutral magistrate . . . ." Id., 906–907. The court "conclude[d] that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial cost of exclusion." Id., 922. Thus, the court recognized an objective "good faith exception for searches conducted pursuant to warrants . . . ." Id., 924. In doing so, however, the court "eschew[ed] inquiries into the subjective beliefs of [such] law enforcement officers . . . [and confined its] good faith inquiry . . . to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id., 922 n.23.

## B

### THE IMPACT OF GENERAL STATUTES § 54-33f AND PRACTICE BOOK §§ 821 AND 822 ON THE EXCLUSIONARY RULE

With this background in mind, we turn to the defendant's claim that no such good faith exception to the exclusionary rule is or should be recognized under Connecticut law. We first consider his argument that General Statutes § 54-33f[5] and Practice Book §§ 821 and

---

[5] "[General Statutes] Sec. 54-33f. MOTION FOR RETURN OF UNLAWFULLY SEIZED PROPERTY AND SUPPRESSION AS EVIDENCE. (a) A person aggrieved by search and seizure may move the court which has jurisdiction of his case or, if such jurisdiction has not yet been invoked, then the court which issued the warrant, or the court in which his case is pending, for the return of the property and to suppress for use as evidence anything so obtained on the ground that: (1) The property was seized without a warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. In no case may the judge who signed the warrant preside at the hearing on the motion.

"(b) The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing.

822[6] mandate suppression of evidence seized pursuant to an invalid search warrant, without regard to the objective, reasonable reliance thereon by the police officers. We disagree. We conclude that the statute and the rules of practice provide only for the procedural implementation of the exclusionary rule; they do not determine its contours or limits.

Because, prior to *Mapp,* "an unreasonable search and seizure did not affect the admissibility of evidence in a [Connecticut] court"; *State* v. *Mariano,* 152 Conn. 85, 90, 203 A.2d 305 (1964), cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1965); "there was no provision in our practice for a motion to suppress." Id., 89. General Statutes § 54-33f was enacted as a consequence of the *Mapp* decision. Id., 90. Thus, the statute must be viewed, in light of this history, as a legislative response to fill a procedural hiatus created by the impact of *Mapp* v. *Ohio,* supra, on our state practice. It cannot be read, as the defendant would have it, as imposing a rigid suppression requirement without regard to the entire body of search and seizure

"(c) The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in the evidence at any hearing or trial."

[6] Practice Book § 821 provides: "Upon motion of the defendant, the judicial authority shall suppress potential testimony or other evidence if he finds that suppression is required under the constitution or laws of the United States or the state of Connecticut."

Practice Book § 822 provides: "A person aggrieved by a search and seizure may make a motion to the judicial authority who has jurisdiction of his case, or if such jurisdiction has not yet been invoked, then to the judicial authority who issued the warrant or to the court in which his case is pending, for the return of specific items of property and to suppress their use as evidence on the grounds that: (1) The property was illegally seized without a warrant under circumstances requiring a warrant; (2) The warrant is insufficient on its face; (3) The property seized is not that described in the warrant; (4) There was not probable cause for believing the existence of the grounds on which the warrant was issued; or (5) The warrant was illegally executed."

jurisprudence to which it implicitly refers. Indeed, our Supreme Court recognized as much early in the life of the statute, when it held evidence obtained in a search made pursuant to an invalid warrant admissible nonetheless because it was also evidence gathered as a result of a search incident to a lawful arrest. *State v. Allen,* 155 Conn. 385, 391–95, 232 A.2d 315 (1967).

The language of § 54-33f supports this reading. Subdivisions (1) through (5) of subsection (a) merely set out some of the bases upon which "[a] person aggrieved by search and seizure may move the court . . . to suppress for use as evidence anything so obtained . . . ." General Statutes § 54-33f (a); see footnote 5, supra. Subsection (c) provides for an evidentiary hearing, if necessary, and further provides that "[*i*]*f the motion is granted,* the property . . . shall not be admissible in evidence at any hearing or trial." (Emphasis added.) Thus, this statute sheds no light on the issue in this case, namely, whether there is a good faith exception to the exclusionary rule, because the issue here is *whether* the motion to suppress should have been granted, which turns on whether there is such an exception.

Nor does the legislative history of § 54-33f help the defendant. It is clear from that history that its principal purpose was to bring our procedure in line with the mandate of *Mapp* v. *Ohio,* supra. See Conn. Joint Standing Committee Hearings, Judiciary and Governmental Functions, Pt. 3, 1963 Sess., p. 875.

Practice Book §§ 821 and 822 lend even less support to the defendant's position. Practice Book § 822, closely tracking General Statutes § 54-33f (a), simply provides for the procedural mechanism of a motion to supress and for the bases of such a motion. Practice Book § 821 implements § 822 by providing that "the judicial authority shall suppress potential testimony or other evidence *if he finds that suppression is required* under

the constitution or laws of the United States or the state of Connecticut." (Emphasis added.) This language makes explicit what is implicit in General Statutes § 54-33f, its statutory progenitor, namely, that the ultimate issue for the court on a motion to suppress under both the statute and the Practice Book, is whether suppression is required by the applicable law; the ultimate issue is not, as the defendant argues, solely whether the search was illegal.

This analysis leads us to conclude that neither the statute nor the Practice Book illuminate the question presented by this case. We turn, therefore, to the defendant's argument that the Connecticut constitution requires suppression in this case without regard to the officer's good faith.

## C
### ARTICLE FIRST, § 7, OF THE CONNECTICUT CONSTITUTION

Article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." The constitutions of 1818 and 1965 contained identical provisions. *State* v. *Kimbro,* supra, 233 n.15. The language of article first, § 7, is almost identical to the fourth amendment to the United States constitution. See footnote 4, supra.

The defendant argues that in *Kimbro,* our Supreme Court recognized that article first, § 7, provides a greater degree of protection of individual rights than does its federal constitutional counterpart, the fourth amendment. Therefore, he argues, the good faith exception to the exclusionary rule, recognized under the fourth amendment, should not be recognized under

the Connecticut constitution because to do so would provide less protection to individual rights than *Kimbro* contemplates. We agree that *Kimbro* decided that article first, § 7, "affords more substantive protection to citizens than does the fourth amendment to the federal constitution in the determination of probable cause." Id., 233. We conclude, nonetheless, that *Kimbro* does not control this case. Furthermore, an independent analysis of the exclusionary rule under article first, § 7, leads us to conclude that there is an exception to that rule where the police have acted in reasonable objective reliance on a search warrant issued by a neutral and detached magistrate.

*Kimbro* does not control this case[7] for several reasons. The issue in *Kimbro* was "whether [article first,

---

[7] As both the defendant and the state recognize, no other decisions of our Supreme Court control this case. See *State* v. *Cates,* 202 Conn. 615, 624, 522 A.2d 788 (1987) ("Because of our holding [that any taint created by an assumed invalid warrant was sufficiently dissipated], we need not discuss under the present circumstances whether a good faith exception to the exclusionary rule exists. See *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677, reh. denied, 468 U.S. 1250, 105 S. Ct. 52, 82 L. Ed. 2d 942 [1984]"). In *Cates,* however, the state constitution was not at issue. The court's discussion was limited to whether, under the federal exclusionary rule, the evidence seized was the fruit of the poisonous tree. *State* v. *Cates,* supra, 619–24. Thus, the court's reference to "whether a good faith exception to the exclusionary rule exists" must be taken to mean whether the federal *Leon* good faith exception applied to the facts of that case. See also *State* v. *Delmonaco,* 194 Conn. 331, 334 n.4, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984) ("Because we hold that the warrant was validly issued . . . we need not decide whether the modification of the exclusionary rule made by *Leon* would sufficiently uphold the rights guaranteed by article first, § 7, of the Connecticut constitution"); *State* v. *Couture,* 194 Conn. 530, 546 n.2, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). In *State* v. *Zindros,* 189 Conn. 228, 254, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984), a pre-*Leon* case, however, the court held that because the record did not support a finding of good faith reliance by the state, it "need not decide whether such an exception to the exclusionary rule exists." The *Zindros* court, however, "[did] not dispute . . . the view that application of the exclusionary rule in a case where there existed reasonable good faith reliance by the police would do little in discouraging improper police conduct." Id., 253.

§ 7,] affords more *substantive* protection to citizens than does the fourth amendment to the constitution *in the determination of probable cause."* (Emphasis added.) Id., 233. *Kimbro* did not involve the scope of the implementation of that protection by way of an exclusionary rule. Neither party discussed the issue of whether the exclusionary rule applied under the state constitution, and, if so, whether there is a good-faith exception to that rule. The *Kimbro* court assumed without discussion that, under the state constitution, a determination that a search is made without probable cause required the suppression of the evidence.[8]

That assumption, however, ignored the established law that there was no exclusionary rule under article first, § 7, of the Connecticut constitution. See *State* v. *DelVecchio,* supra; *State* v. *Carol,* supra; *State* v. *Magnano,* supra; *State* v. *Griswold,* supra. We, therefore, are confronted with the preliminary question of whether *Kimbro* overruled, sub silentio, that long line of cases stretching back to 1896; *State* v. *Griswold,* supra; including a 1962 case decided after *Mapp. State* v. *DelVecchio,* supra. We do not ordinarily "indulge in the presumption that the Supreme Court would so

---

[8] In cases subsequent to *State* v. *Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985), attempts by defendants to persuade our Supreme Court to adopt *Kimbro's* more expansive approach in other criminal constitutional contexts, have met with mixed results. Compare *State* v. *Fleming,* 198 Conn. 255, 260–63, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986) (state constitution does not bar prosecution following illegal arrest), and *State* v. *Gethers,* 197 Conn. 369, 497 A.2d 408 (1985) (no state constitutional right to hybrid representation), with *State* v. *Stoddard,* 206 Conn. 157, 537 A.2d 446 (1988) (state due process clause requires that suspect in custody be informed promptly of timely efforts by counsel to render pertinent legal assistance). These cases strongly suggest that *Kimbro* did not lay down an automatic welcome mat to such claims, and that whether the state constitution in any criminal case affords greater protection to the defendant than does the federal constitution must be determined on a case-by-case basis, taking into account the nature and purpose of the right involved, prior case law, history, and the impact on law enforcement. See, e.g., *State* v. *Stoddard,* supra.

cavalierly overrule such [ancient and] recent authority without even acknowledging that it was doing so." *State* v. *Farrar,* 7 Conn. App. 149, 154–55, 508 A.2d 49, cert. denied, 200 Conn. 805, 512 A.2d 229 (1986); see also *Cummings* v. *Tripp,* 204 Conn. 67, 76–77, 527 A.2d 230 (1985) (court should not overrule prior decision unless required by cogent reasons and inescapable logic). If, therefore, based on this reasoning, we assume that the prior cases interpreting article first, § 7, are still good law despite *Kimbro,* the trial court's judgment in this case, refusing to suppress the evidence pursuant to the state constitution, would have to stand on the alternate basis that a violation of article first, § 7, does not require the exclusion of otherwise admissible evidence.

At the same time, however, we cannot simply ignore *Kimbro* and the history which preceded it. Careful consideration of *Kimbro* and that history convinces us that our Supreme Court, if squarely presented with the issue of whether article first, § 7, as read in the light of current constitutional considerations and more recent legal history, requires the suppression of illegally seized evidence under the appropriate circumstances, would explicitly overrule the prior cases and hold that the exclusionary rule is an appropriate procedural remedy to enforce the substantive command of article first, § 7.

This court on occasion has taken the step of reading our Supreme Court's "tea leaves" and predicting that, because of intervening decisions, the court would overrule prior cases and change its position. In *Yale Literary Magazine* v. *Yale University,* 4 Conn. App. 592, 601, 496 A.2d 201 (1985), aff'd, 202 Conn. 672, 522 A.2d 818 (1987), we stated our belief "that the Connecticut Supreme Court would, as it has in the past, change its position on the appealability of a disqualification of an attorney." On the basis of that belief, we held an order denying a motion of an out-of-state attorney to appear

pro hac vice not to be an appealable final judgment, despite *Silverman* v. *St. Joseph's Hospital,* 168 Conn. 160, 363 A.2d 22 (1975), in which the Supreme Court had decided an appeal from such an order. That prediction and holding proved to be correct upon further review by our Supreme Court. *Yale Literary Magazine* v. *Yale University,* 202 Conn. 672, 522 A.2d 818 (1987). We believe that the same process would result regarding the relationship between article first, § 7, and the exclusionary rule.

First, the rule has gained overwhelming judicial acceptance as the most effective method of guaranteeing the protection against unreasonable invasion of privacy secured by constitutional search and seizure provisions. The United States Supreme Court has continued to adhere to the view that the rule's deterrent effect is necessary; see, e.g., *Stone* v. *Powell,* supra, 465; and has met the criticisms of it by limiting its scope to match its purpose. See, e.g., *United States* v. *Leon,* supra. State courts have also endorsed its deterrent effect. See, e.g., *State* v. *Brown,* 708 S.W.2d 140, 146–47 (Mo. 1986) (en banc); *State* v. *Novembrino,* 105 N.J. 95, 147–59, 519 A.2d 820 (1987); *People* v. *Bigelow,* 66 N.Y.2d 417, 427, 488 N.E.2d 451, 487 N.Y.S.2d 630 (1985); *Commonwealth* v. *Melilli,* 361 Pa. Super. 429, 438, 522 A.2d 1107, (1987); see also *Stringer* v. *State,* 491 So. 2d 837, 848–51 (Miss. 1986) (Robertson, J., concurring). We believe that our Supreme Court, in interpreting article first, § 7, would do the same, and would not ignore this substantial body of modern search and seizure jurisprudence.

Second, in 1961, when *Mapp* v. *Ohio,* supra, was decided, the United States Supreme Court noted the growing trend among state courts to apply their own exclusionary rules. See id., 651. That trend has continued. See generally S. Abrahamson, "Criminal Law and State Constitutions: The Emergence of State Con-

stitutional Law," 63 Tex. L. Rev. 1141 (1985); G. Dix, "Exclusionary Rule Issues as Matters of State Law," 11 Am. J. Crim. L. 109 (1983); note, "Stepping into the Breach: Basing Defendants' Rights on State Rather than Federal Law," 15 Am. Crim. L. Rev. 339 (1978). Our Supreme Court has on occasion expressed sensitivity to trends or concerns expressed by other state courts in interpreting their state constitutions which are similar to ours. See, e.g., *State* v. *Kimbro,* supra, 236 nn.18 and 19; *State* v. *Stoddard,* supra.

Third, in several post-*Mapp* and pre-*Kimbro* cases, our Supreme Court intimated, in the context of deciding whether evidence was properly excluded pursuant to the federal exclusionary rule, that article first, § 7, has a meaning substantially equivalent to the fourth amendment. See *State* v. *Federici,* 179 Conn. 46, 51–52, 425 A.2d 916 (1979) (analogizing protection provided by fourth amendment to that provided by article first, § 7); accord *State* v. *Rice,* 172 Conn. 94, 97, 374 A.2d 128 (1976); *State* v. *Watson,* 165 Conn. 577, 584, 345 A.2d 532 (1973); *State* v. *DeNegris,* 153 Conn. 5, 8, 212 A.2d 894 (1965); *State* v. *Mariano,* supra, 89; *State* v. *Collins,* 150 Conn. 488, 492, 191 A.2d 253 (1963); *State* v. *Fahy,* 149 Conn. 577, 585–86, 183 A.2d 256 (1962), rev'd on other grounds, 375 U.S. 85, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963); see also *D'Amico* v. *Reincke,* 155 Conn. 627, 629, 236 A.2d 914 (1967) (equation of fourth amendment and article first, § 7, in context of motion to dismiss based on illegal arrest); D. Borden & D. Jaffe, "The Trouble with *Licari;* Irony and Anomaly," 55 Conn. B.J., 463, 474–75 (1981). This line of authority suggests that even before *Kimbro* our Supreme Court was prepared to consider an exclusionary rule to be an appropriate remedy to effectuate our state constitutional prohibition against unreasonable searches and seizures.

Fourth, in a related but nonconstitutional context, our Supreme Court has applied an exclusionary rule.

In *State* v. *Surowiecki,* 184 Conn. 95, 440 A.2d 798 (1981), the court held suppressible evidence gathered pursuant to a search warrant which the judge had inadvertently neglected to sign. See also *State* v. *Cook,* 183 Conn. 520, 441 A.2d 41 (1981) (arrest warrant signed by clerk rather than judge, as required by Practice Book, invalid; motion to dismiss required to be granted).

Having concluded that our Supreme Court would squarely hold that there is an exclusionary rule under article first, § 7, we consider whether there is an exception to that rule for objective good faith reliance by the police on a search warrant issued by a neutral and detached magistrate. We conclude that there is such an exception.

The nature and purpose of the exclusionary rule are such that where evidence is seized in reasonable, good faith reliance on a warrant, an exception to the rule is appropriate. As *United States* v. *Leon,* supra, made clear, the rule is not an inherent part of or necessary corollary to the constitutional right to be free from unreasonable searches and seizures; it is, instead, a judicially created remedy designed to safeguard that right. Id., 906; see also *Immigration and Naturalization Service* v. *Lopez - Mendoza,* 468 U.S. 1032, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984); *Stone* v. *Powell,* supra; *United States* v. *Janis,* supra; *United States* v. *Calandra,* supra. The United States Supreme Court, the Connecticut Supreme Court and this court have recognized that its purpose is to deter future police misconduct by removing the principal inducement to that misconduct. We see nothing in either the language or history of article first, § 7, to suggest a different nature or purpose attached to an exclusionary rule fashioned under the state constitution.

Where the police are acting in objective, reasonable reliance on a search warrant issued by a neutral and

detached magistrate, there can be no future misconduct to deter. They are doing what any reasonable police officers would believe they are supposed to do, namely, following the authorization to search and seize provided them by that magistrate, and any future police officers would undoubtedly do the same. Such a situation simply does not come within the purpose of the rule. An exception to the exclusionary rule for such conduct is therefore appropriate.

Furthermore, we agree with the reasoning of *United States* v. *Leon,* supra, 906–907, that whether the sanction of exclusion is applied "must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective." We also agree with the *Leon* court that, in performing that weighing process, "the marginal or nonexistent benefits produced by suppressing [such] evidence . . . cannot justify the substantial costs of exclusion." Id., 922. Where, as here, there is no perceivable deterrent effect on police misconduct, application of the exclusionary rule " 'would impede unacceptably the truth-finding function of judge and jury' "; id., 907, quoting *United States* v. *Payner,* 447 U.S. 727, 734, 100 S. Ct. 2439, 65 L. Ed. 2d 468 (1980); with the "objectionable collateral consequence" of a significant number of guilty persons going free or receiving "reduced sentences as a result of favorable plea bargains." *United States* v. *Leon,* supra.

Our available Supreme Court precedent also suggests that such an exception exists. Although we have decided that our Supreme Court would abandon its earlier position that there is no exclusionary rule under

the Connecticut constitution,[9] we cannot blind ourselves to the light that earlier position sheds on the scope of such an exclusionary rule. Since our earlier jurisprudence taught that article first, § 7, did not involve an exclusionary rule, that same jurisprudence suggests that when article first, § 7, is read to involve such a rule, the rule would be subject to an exception which is directly related to the nature and purpose of that rule. Furthermore, in *State* v. *Fleming,* supra, our Supreme Court linked the procedural protection provided by article first, § 7, to the protection provided by the fourth amendment to the United States constitution. That linkage suggests that the principal procedural remedy to effectuate the substantive protection provided by both article first, § 7, namely the exclusionary rule, should also be subject to a similar exception.[10]

[9] Although our Supreme Court has reminded us that in interpreting our constitution we should pay heed to its history and the intentions of its authors; *Cologne* v. *West Farms Associates,* 192 Conn. 48, 62, 469 A.2d 1201 (1984); in this case, neither that history nor those intentions are sufficiently disclosed to us so as to be of help in resolving the issue before us. The available records regarding the purpose of our state constitutional bill of rights shed no light on whether article first, § 7, should be read to include a good faith exception. See, e.g., R. Purcell, Connecticut in Transition, 1775–1818 (1918) pp. 381–85; J. Trumbull, Historical Notes on the Constitutions of Connecticut (1901) pp. 55–57; Connecticut Courant, Sept. 8, 1818, p. 2, col. 1 to p. 3, col. 1.

[10] We note that there is a split of authority among those jurisdictions that have considered whether a good faith exception to the exclusionary rule applies under their state constitutions. The following support the good faith exception: *Jackson* v. *State,* 291 Ark. 98, 722 S.W.2d 831 (1987); *State* v. *Rice,* 109 Idaho 985, 712 P.2d 686 (Ct. App. 1985); *Mers* v. *State,* 482 N.E.2d 778 (Ind. Ct. App. 1985); *State* v. *Huber,* 704 P.2d 1004 (Kan. Ct. App. 1985); *State* v. *Wood,* 457 So. 2d 206 (La. 1984); *State* v. *Shannon,* 472 So. 2d 286 (La. Ct. App. 1985); *Howell* v. *State,* 60 Md. App. 463, 483 A.2d 780 (1984); *State* v. *Brown,* 708 S.W.2d 140 (Mo. 1986) (en banc); *Commonwealth* v. *Melilli,* 361 Pa. Super. 429, 522 A.2d 1107 (1987). Fewer have declined to recognize such an exception: *People* v. *Sundling,* 395 N.W.2d 308 (Mich. Ct. App. 1986); *State* v. *Novembrino,* 105 N.J. 95, 519 A.2d 820 (1987); *People* v. *Bigelow,* 66 N.Y.2d 417, 488 N.E.2d 451, 487 N.Y.S.2d 630 (1985); *State* v. *Grawein,* 123 Wis. 2d 428, 367 N.W.2d 816 (Ct. App. 1985); see also *Stringer* v. *State,* 491 So. 2d 837, 841 (Miss. 1986) (Robertson, J., concur-

The same reasoning which leads us to conclude that there is a good faith exception to our state exclusionary rule requires, of course, that certain limits to the exception also apply. Thus, as the *Leon* court indicated, the reasonable good faith exception does not apply (1) where the issuing magistrate was misled within the standards of *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), (2) where the magistrate wholly abandoned his judicial role, as in *Lo-Ji Sales, Inc.* v. *New York,* 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979), (3) where the warrant was so lacking in indicia of probable cause that the police officers could not have a reasonable belief in its validity; see *Brown* v. *Illinois,* 422 U.S. 590, 610–11, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (Powell, J., concurring); and (4) where the warrant was so facially deficient in its lack of particularity, regarding the place to be searched or the things to be seized, that the executing officer could not reasonably presume it to be valid. *United States* v. *Leon,* supra, 923.

Applying these principles to the facts of this case, we conclude that the trial court did not err in applying the good faith exception. After a full evidentiary hearing, the court found that the officers acted in reasonable, good faith reliance on the warrant. It also found that the issuing judge was not misled by the police. See *Franks* v. *Delaware,* supra. These findings are fully supported by the evidence. It is clear, furthermore, that the judge did not abandon his judicial role in issuing

ring). In addition, two states have declined to recognize a good faith exception to their statutory exclusionary rules. See *Commonwealth* v. *Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985); *Dees* v. *State,* 722 S.W.2d 209 (Tex. Crim. App. 1986). Of the five jurisdictions declining to find a good faith exception under their state constitutions, four rely heavily on the fact that, unlike Connecticut, their constitutions had been read to embody an exclusionary rule long before *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); see *People* v. *Sundling,* supra; *State* v. *Novembrino,* supra; *State* v. *Grawein,* supra; *Stringer* v. *State,* supra.

the warrant. Indeed, the seven page affidavit indicates, by the judge's signature in the margin of each page, that he read and considered its contents. Nor can it be seriously argued that the warrant is so lacking in indicia of probable cause or is so unparticularized that the police could not have a reasonable belief in its validity.

## III

### THE POST INTERCEPT NOTICE REQUIREMENT OF GENERAL STATUTES § 54-41k

The defendant's final claim is that the court erred in denying his motion to suppress the contents of certain intercepted wire communications. We disagree.

General Statutes § 54-41k provides in pertinent part that "[w]ithin a reasonable time but not later than ninety days next succeeding the termination of the period of [a wiretap] order or extension thereof, the . . . panel . . . shall cause to be served on persons not named in the order or the application whose communications were intercepted, an inventory" of the authorized wiretap. The defendant was such an unnamed person whose conversations were intercepted pursuant to the authorized wiretap of Hall's telephones.

The trial court found that the inventory was sent to the defendant within the statutory time, and that the defendant received it. These findings were amply supported by the evidence, namely, that the panel sent the inventory to the defendant at his home address by certified mail, return receipt requested, that it was signed for by Mary Brown and Shirley Campbell, that Campbell delivered it to the defendant, and that the defendant wrote two letters to the panel referring to his receipt of the inventory.

In his brief in this court, the defendant appears to claim that General Statutes § 54-41k was not complied with "because such notice was never received by the

defendant." At oral argument, however, acknowledging the court's finding of such receipt, he refined his claim to be that General Statutes § 54-41k requires personal, in-hand service on the defendant and not service by certified mail. On the facts of this case, the defendant's argument is untenable.

We acknowledge "that strict compliance with the service of inventory requirement was intended by the legislature to be a substantial part of" the legislative scheme of the wiretap act. *State* v. *Formica,* 3 Conn. App. 477, 480, 489 A.2d 1060, cert. denied, 196 Conn. 806, 494 A.2d 903 (1985). We also recognize, however, "that *failure* of such compliance requires suppression under General Statutes § 54-41m." (Emphasis added.) Id. There was no such failure here, because the defendant was given actual and timely notice pursuant to the method employed by the panel.

Neither the language nor the purpose of General Statutes § 54-41k supports the defendant's argument. The language requires that the panel "cause the inventory of the wiretap to be served. . . . " It does not specify any particular method of service. The purpose of this service on an unnamed interceptee is to alert "him promptly to the fact that his conversations were intercepted, thus enabling him to obtain from the panel copies of his conversations, the applications and orders 'immediately upon the filing of a motion requesting such information'; General Statutes § 54-41k; and enabling him promptly to seek his civil remedies under General Statutes § 54-41r." *State* v. *Formica,* supra, 482–83. This purpose was fulfilled in this case. Under these circumstances, we decline to impose a requirement of service more strict than that satisfied here.

There is no error.

In this opinion the other judges concurred.